TODD KIM
Assistant Attorney General
SHEILA McANANEY (ILBN 6309635)
BRIAN D. SCHAAP (DCBN 1780655)
SAMANTHA M. RICCI (CABN 324517)
Trial Attorneys
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: (202) 616-6535 (McAnaney)
Emails: Sheila.McAnaney@usdoj.gov
Brian.Schaap@usdoj.gov
Samantha.Ricci@usdoj.gov
MARK C. ELMER (DCBN 453066)
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1352
Email: Mark.Elmer@usdoj.gov

*Attorneys for Plaintiff United States of America*

(Counsel cont'd on next page)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and PEOPLE OF THE STATE OF CALIFORNIA by and through CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO BAY REGION,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
MICHELLE LO (NYRN 4325163)
Chief, Civil Division
EKTA DHARIA (NYRN 5219860)
MICHAEL T. PYLE (CABN 172954)
Assistant United States Attorneys
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7276
Facsimile: (415) 436-6748
Email: Ekta.Dharia@usdoj.gov

*Attorneys for Plaintiff United States of America*

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
BRYANT B. CANNON (SBN 284496)
MARC N. MELNICK (SBN 168187)
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-0750
Fax: (510) 622-2270
E-mail: Marc.Melnick@doj.ca.gov

*Attorneys for Plaintiff People of the State of California by and through the California Regional Water Quality Control Board, San Francisco Bay Region*

**COMPLAINT**

Plaintiffs, the United States of America ("the United States"), by the authority of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the People of the State of California by and through the California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Water Board"), by and through the undersigned attorneys, file this Complaint, and allege as follows:

**NATURE OF ACTION**

1. This matter is brought pursuant to the federal Clean Water Act ("CWA") and analogous California laws against the City and County of San Francisco (the "City"), through its Public Utilities Commission ("SFPUC"), for its repeated and widespread failures to operate its two combined stormwater-sewer systems and sewage treatment plants in compliance with the law and its permits, and in a manner that keeps untreated sewage off the streets and beaches of San Francisco, and other areas with risk of human contact. The City's failures to comply with its permits or properly operate its system significantly increases the risk that members of the public, including, for example, surfers, swimmers, and others recreating on beaches, unknowingly come into contact with untreated sewage, which contains pathogens and high enterococci and E.coli bacteria levels.

2. The City's combined sewer systems transport untreated domestic sewage, industrial and commercial wastewater, and stormwater run-off (together, "combined sewage") through single-pipe systems for treatment prior to discharge in the Pacific Ocean, San Francisco Bay, and its tributaries. In periods of rainfall, as the volume of stormwater in the pipes rises, total flows in the systems can exceed the systems' capacities, at which point the City discharges the combined sewage into San Francisco Bay and its tributaries or over beaches into the Pacific Ocean. These discharges are known as Combined Sewer Overflows ("CSOs"). The City's CWA permits require it to operate and maintain its combined sewer systems in a manner that minimizes CSOs and to take affirmative steps to prevent the public from contacting combined sewage, including by clearly notifying the public where CSOs occur and of the risks of contact

with combined sewage. This action concerns the City's failure to operate and maintain its systems in compliance with its CWA permits; the City's unauthorized discharges of billions of gallons of combined sewage each year onto the beaches of San Francisco and into San Francisco Bay and its tributaries; and the City's failure to adequately plan and prepare for, respond to, report, or provide public warnings for releases, overflows and backups of combined sewage and other pollutants to homes, yards, streets, and sidewalks.

3. This is a civil action for injunctive relief and civil penalties brought under Sections 309(b) and (d) of the federal CWA, 33 U.S.C. § 1319(b) and (d), and supplemental state claims brought pursuant to Sections 13385 and 13386 of the California Water Code ("Water Code"). The United States and the Regional Water Board allege that the City, through SFPUC, violated and continues to violate conditions and limitations established in National Pollutant Discharge Elimination System ("NPDES") permits issued to it by the Regional Water Board and EPA under 33 U.S.C. § 1342, and violated and continues to violate Section 301 of the CWA, 33 U.S.C. § 1311, by discharging pollutants without NPDES permit authorization.

4. The Regional Water Board has joined this action as a plaintiff pursuant to Section 309(e) of the CWA, 33 U.S.C. § 1319(e).

## **JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

5. This Court has jurisdiction over the subject matter of this action and the parties pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

6. In addition, this Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a), because the state law claims are related to the federal claims and form part of the same case or controversy.

7. This Court also has jurisdiction over the parties in this action.

8. Venue is proper in the Northern District of California pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1397, because the City is located in this judicial district and the causes of action alleged in this Complaint arose in this district.

9. Divisional assignment is proper in the San Francisco or Oakland Divisions pursuant to Civil L.R. 3-2, because the events and omissions giving rise to this Complaint occurred primarily in San Francisco County.

**AUTHORITY AND NOTICE**

10. Authority to bring this action is vested in the Attorney General of the United States under Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

11. Authority to bring this action is vested in the Attorney General of the State of California under Sections 13385(b) and 13386 of the Water Code.

12. As a signatory to this Complaint, the State of California, through the Regional Water Board, has notice of the commencement of this action, as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

**PARTIES**

13. Plaintiff United States is acting at the request and on behalf of the EPA Administrator.

14. Plaintiff Regional Water Board is acting under state law with responsibility for ensuring compliance with federal and state water quality laws within the San Francisco Bay region. Cal. Water Code §§ 13200(b), 13201(a), 13225.

15. The City is a political subdivision of the State of California. The City is a "municipality" and a "person" within the meaning of Section 502(4) and (5) of the CWA, 33 U.S.C. § 1362(4) and (5), and a "person" pursuant to Section 13050(c) of the Water Code.

16. SFPUC is a department of the City.

17. The City, through SFPUC, owns and has authority and control over, and has responsibility for, its combined sewer systems, and the collection of stormwater and wastewater from municipal sources, including residential, commercial, and industrial facilities within San Francisco, and transportation of the combined sewage to wastewater treatment plants for proper treatment and discharge.

## STATUTORY AND REGULATORY BACKGROUND

**Federal Clean Water Act**

18. The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA established a national goal to eliminate the discharge of pollutants to navigable waters. 33 U.S.C. § 1251(a)(1).

19. To achieve that goal, the CWA prohibits the "discharge of any pollutant" by any person to navigable waters of the United States except as authorized by an NPDES permit. 33 U.S.C. § 1342.

20. The CWA defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

21. The CWA defines "pollutant" to include sewage and municipal and industrial waste. 33 U.S.C. § 1362(6).

22. The CWA defines "navigable waters" to be "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "Waters of the United States" has been defined to include, *inter alia*, all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce; and tributaries to such waters. 88 Fed. Reg. 61,964 (Sept. 8, 2023) (amending 88 Fed. Reg. 3004 (Jan. 18, 2023)).

23. The CWA defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

24. The CWA authorizes the Administrator of EPA to require the owner or operator of any point source to provide such information as the Administrator may reasonably need to carry out the objectives of the CWA. 33 U.S.C. § 1318.

**NPDES Permit Program and Combined Sewer Overflow Control Policy**

25. The CWA provides that the Administrator of EPA may issue NPDES permits to authorize the discharge of pollutants into waters of the United States, subject to the conditions and limitations set forth in such permits. 33 U.S.C. § 1342(a).

26. The CWA provides that a state may establish its own permit program, and after receiving EPA's authorization of that program, may issue NPDES permits within its jurisdiction. 33 U.S.C. § 1342(b).

27. At all times relevant to this Complaint, EPA has authorized the State of California, through its State Water Resources Control Board ("State Water Board") and nine Regional Water Quality Control Boards (collectively "Water Boards"), to administer the NPDES program for regulating discharges of pollutants to navigable waters within its jurisdiction. Approval of California's Revisions to the State National Pollutant Discharge Elimination System Program, 54 Fed. Reg. 40,664 (Oct. 3, 1989); Discharges of Pollutants to Navigable Waters: Approval of State Programs, 39 Fed. Reg. 26,061 (July 16, 1974). Navigable waters within California's jurisdiction include territorial seas, which are defined to extend three miles from the coast. 33 U.S.C. § 1362(8).

28. EPA retains concurrent enforcement authority for navigable waters within the jurisdiction of the State of California. 33 U.S.C. § 1342(i).

29. EPA is the NPDES permit-issuing agency for discharge points more than three miles offshore.

30. The CWA directs the Administrator of EPA or authorized NPDES permit authority to prescribe conditions and limitations, including effluent limitations, for NPDES permits to ensure compliance with the requirements of the CWA. 33 U.S.C. § 1342(a)(2). Effluent limitations, as defined by the CWA, are restrictions on the quantity, rate, and concentration of chemical, physical, biological, and other constituents that are discharged from point sources into navigable waters. 33 U.S.C. § 1362(11).

31. The CWA provides that each permit, order, or consent decree issued after December 21, 2000, for discharges from a combined sewer system, must conform to U.S. EPA's Combined Sewer Overflow Control Policy ("CSO Policy"), 59 Fed. Reg. 18,688 (April 19, 1994). 33 U.S.C. § 1342(q).

32. Combined sewer systems are wastewater collection systems owned by a state or municipality designed to carry wastewaters (domestic, commercial, and industrial wastewaters)

and stormwater (surface drainage from rainfall or snowmelt) through a single-pipe system to a treatment plant for treatment and discharge. CSO Policy at 18,688. In periods of rainfall or snowmelt, total wastewater flows can exceed the capacity of the system. The result of such excess flow can be a CSO or the discharge from a combined sewer system at a designated point *prior to* treatment. *Id.* at 18,689. CSOs often contain high levels of suspended solids, pathogenic microorganisms, toxic pollutants, floatables, nutrients, oxygen-demanding organic compounds, oil and grease, and other pollutants which may pose risks to human health and threaten aquatic life and its habitat. *Id.*

33. The CSO Policy prescribes the steps that municipalities with combined sewer systems and CSOs must take to plan, select, and implement CSO controls that achieve compliance with water quality standards and protection of designated uses for receiving waters.

34. The CSO Policy requires that NPDES permits issued to permittees with CSOs include a requirement to implement the Nine Minimum Controls, which are measures to reduce the frequency and volume of CSOs and their effects on receiving water quality. *Id.* at 18,690. The Nine Minimum Controls include the proper operation and maintenance of combined sewer systems, maximizing flow to treatment facilities, prohibition of CSOs in dry weather, notification of the public of CSOs, and monitoring and reporting of CSOs.

35. The CSO Policy also requires that any NPDES permit issued to a permittee with CSOs include a requirement to develop and implement a Long-Term Control Plan ("LTCP") that details how the permittee will minimize or prevent CSOs and achieve compliance with the CWA, including compliance with water quality standards and protection of designated uses. *Id.* at 18,691, 18,694.

36. The CSO Policy identifies controlling overflows to sensitive areas, such as waters with primary contact recreation, as the highest priority when controlling combined sewer overflows. *Id.* at 18,692.

**State Law**

37. The Water Boards have primary responsibility for the coordination and control of water quality in California. Cal. Water Code §§ 13001, 13200 (defining the boundary of San Francisco Bay region).

38. No provision of Division 7 of the Water Code, Cal. Water Code §§ 13000-16104, or any ruling of the Water Boards is a limitation on, among other things, "the power of the [California] Attorney General, at the request of a regional board, the state board, or upon his own motion, to bring an action in the name of the people of the State of California to enjoin any pollution or nuisance."

39. Chapter 5.5 of the Water Code, Cal. Water Code §§ 13370-13389, "shall be construed to ensure consistency with the requirements for state programs implementing the [CWA] and acts amendatory thereof or supplementary thereto." Cal. Water Code § 13372.

40. The terms "navigable waters," "administrator," "pollutants," "biological monitoring," "discharge," and "point sources" "shall have the same meaning as in the [CWA] and acts amendatory thereof or supplementary thereto." Cal. Water Code § 13373.

41. The term "waste discharge requirements" is the equivalent of the term "permits" (*e.g.*, NPDES permits) as used in the CWA. Cal. Water Code § 13374.

42. Section 13376 of the Water Code provides that "[a] person who discharges pollutants or proposes to discharge pollutants to the navigable waters of the United States within the jurisdiction of this state . . . shall file a report of the discharge in compliance with the procedures set forth in Section 13260." Except as authorized by waste discharge requirements, the discharge of pollutants or the operation of a publicly owned treatment works treating sewage is prohibited. Cal. Water Code § 13376.

43. Section 13377 of the Water Code provides that "the state or the regional boards shall . . . issue waste discharge requirements . . . which apply and ensure compliance with all applicable provisions of the [CWA] . . . together with any more stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance." Cal. Water Code § 13377.

44. Section 13383(a) of the Water Code authorizes the Regional Water Board to "establish monitoring, inspection, entry, reporting, and recordkeeping requirements . . . for any person who discharges, or proposes to discharge, to navigable waters, . . . [or] any person who owns or operates . . . a publicly owned treatment works . . . treating domestic sewage . . . ." Cal. Water Code § 13383(a).

**Federal and State Enforcement Provisions**

45. The CWA authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates, among other provisions, 33 U.S.C. §§ 1311 and 1318, or who violates any condition or limitation of an NPDES permit issued pursuant to 33 U.S.C. § 1342. 33 U.S.C. § 1319(b).

46. The CWA provides that any person who violates, among other provisions, 33 U.S.C. §§ 1311 and 1318, or who violates any condition or limitation of an NPDES permit issued pursuant to 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed $25,000 per day of violation, as adjusted over time, with each day in which a violation occurs constituting a separate violation. 33 U.S.C. § 1319(d).

47. Under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note: Pub. L.114-74, § 701, CWA statutory penalties have been adjusted for inflation through 40 C.F.R. § 19.4. As adjusted for inflation pursuant to statute, the relevant maximum civil penalties under Section 309(d) of the CWA are:

- $37,500 per day per violation for violations occurring from January 13, 2009 through November 2, 2015; and
- $66,712 per day per violation for violations that occurred on or after November 3, 2015.

48. Sections 13385(b) and 13386 of the Water Code authorize the Regional Water Board to commence a civil action for appropriate relief, including a preliminary and/or permanent injunction, upon any threatened or continuing violation of, among other provisions,

Sections 13376 and 13383 of the Water Code, a requirement of 33 U.S.C. §§ 1311 and 1318, or a waste discharge requirement issued pursuant to Chapter 5.5 of the Water Code, Cal. Water Code §§ 13370-13389.

49. A person who violates Sections 13376 and 13383 of the Water Code, a requirement of 33 U.S.C. §§ 1311 or 1318, or a waste discharge requirement issued pursuant to Chapter 5.5 of the Water Code, Cal. Water Code §§ 13370-13389, shall be subject to civil liability not to exceed $25,000 per day of violation and, where there is a discharge, $25 per gallon discharged and not cleaned up in excess of 1,000 gallons. Cal. Water Code § 13385(a)-(b).

## GENERAL ALLEGATIONS

50. The San Francisco Peninsula is home to many beaches and recreational areas on San Francisco Bay and the Pacific Ocean. These scenic areas draw tens of millions of residents and tourists each year, year-round, to both enjoy the views and take part in water recreation activities such as swimming, surfing, and boating.

51. San Francisco Bay is also home to many aquatic species including the endangered tidewater goby, threatened and endangered salmonids, and other fish species; shellfish; and prey species consumed by estuarine mammals, waterfowl, and shorebirds.

52. The City is responsible for the operation and management of its stormwater and wastewater collection, treatment, and discharge facilities.

53. Since 2016, the City has discharged an average of 1.8 billion gallons of combined sewage, which includes untreated sewage, each year from its combined sewer systems into the Pacific Ocean and San Francisco Bay and its tributaries, including from outfalls on Ocean Beach, near Crissy Field Beach, and other recreated locations in San Francisco. In the 2022-2023 wet weather season alone, which extends from October to March, the City discharged over four billion gallons of combined sewage.

54. Infectious organisms contained in combined sewage can cause a number of adverse health effects on people, ranging from minor illnesses such as sore throats and mild

gastroenteritis (causing stomach cramps and diarrhea) to life-threatening ailments such as cholera, dysentery, infectious hepatitis, and severe gastroenteritis.

55. Incidental ingestion of water contaminated by combined sewage can result in gastrointestinal illness, especially in areas with primary contact recreation, such as swimming, surfing, or water sports. Respiratory illness and eye, ear, skin, and wound infections can also result from contact with water contaminated by CSOs.

56. Children, the elderly, people with weakened immune systems, and pregnant women are at greater risk for adverse consequences from such infections than the general population. People who acquire infections from pathogens in combined sewage may become infectious and transmit disease to the community, putting susceptible populations at risk.

57. Combined sewage also contains elevated levels of metals such as copper and elevated levels of ammonia, which may be toxic to aquatic life including fish, shellfish, and prey species consumed by estuarine mammals, waterfowl, and shorebirds. The impacts can be lethal or sublethal, including interfering with reproduction and thereby reducing populations.

58. At all times relevant to this Complaint, the City has owned and operated two distinct and separately permitted combined sewer systems that collect, store, transport, and treat combined sewage: the Bayside System and the Oceanside System. These systems are depicted below in Figure 1.

59. The Bayside System collects approximately 80 percent of the City's combined sewage from eastern San Francisco and portions of Brisbane and Daly City. The Bayside System comprises the Southeast Water Pollution Control Plant ("Southeast Plant"), the North Point Wet Weather Facility ("North Point Facility"), twenty-nine permitted CSO Outfalls (some of which are part of CSO discharge structures ("CSD Structures")), and the associated collection system (including pump stations, transport and storage structures, and approximately 600 miles of sewer pipes).

60. The Oceanside System collects approximately 20 percent of the City's combined sewage from western San Francisco and portions of Daly City. The Oceanside System comprises the Oceanside Water Pollution Control Plant ("Oceanside Plant"), seven permitted

CSO Outfalls (some of which are part of CSD Structures), and the associated collection system (including pump stations, transport and storage structures, and approximately 300 miles of sewer pipes).

61. The Bayside System and the Oceanside System are each "treatment works" as that term is defined in 33 U.S.C. § 1292(2), and "publicly owned treatment works" as that term is defined in 40 C.F.R. § 122.2 (cross-referencing the definition at 40 C.F.R. § 403.3).

62. Components of the Bayside System and the Oceanside System were designed to transport combined sewage to achieve particular flow capacities. Meeting these design capacities requires proper operation, regular maintenance and cleaning, as well as rehabilitation, repair, or replacement of elements of the combined sewer systems such as pipes or pump station components.

63. In wet weather, when flows exceed the capacity of the systems, both the Bayside System and the Oceanside System transport combined sewage to CSD Structures for discharge through CSO Outfalls. Discharges of combined sewage are referred to as CSOs, Combined Sewer Discharges, or Combined Sewer Overflow Discharges (hereinafter "CSOs").

64. The combined sewage transported through the Bayside and Oceanside Systems contains "pollutants" within the meaning of 33 U.S.C. § 1362(6) and (12).

65. Flow in excess of the combined sewer systems' capacity and restrictions in capacity caused by improper maintenance can also result in releases, overflows, backups, and unauthorized discharges of combined sewage in places where the public can come into contact with the untreated sewage, such as streets, yards, and parks.




*Figure 1: The City's Bayside and Oceanside Systems*

**Bayside System and Southeast Plant**: **Background and NPDES Permits**

66. In dry weather, the Bayside System conveys wastewater flows to the Southeast Plant, which provides secondary treatment and discharges the treated wastewater to San Francisco Bay through a deep water outfall ("Southeast Bay Outfall").

67. In wet weather, when combined sewage flows exceed the capacity of the Southeast Bay Outfall, the City is permitted to discharge excess flows of secondary-treated effluent through a shallow water outfall into Islais Creek, a tributary of San Francisco Bay.

68. In wet weather, as combined sewage flows approach the storage capacity of the collection system in the northern area of the Bayside System, the City is permitted to discharge

combined sewage from the North Point Wet Weather Facility to San Francisco Bay after combined sewage receives some primary treatment and disinfection.

69. In wet weather, when combined sewage flows exceed Bayside System storage, treatment, and pumping capacity, the City is permitted to discharge the excess combined sewage as CSOs through twenty-nine CSO Outfalls into San Francisco Bay and its tributaries, including Islais Creek and Mission Creek. These discharges receive minimal removal of solids and no disinfection to destroy bacteria or other pathogens.

70. Since at least October 2016, the City has discharged approximately eleven billion gallons of combined sewage from the Bayside CSOs. Approximately 83% of those discharges, or almost nine billion gallons, have been to Mission and Islais Creeks. These discharges eventually flow into San Francisco Bay.

71. The receiving waters for the Bayside System's permitted outfalls, including the twenty-nine CSO Outfalls, are all "waters of the United States" and "navigable waters" within the meaning of 33 U.S.C. § 1362(7) and 40 C.F.R. § 122.2 (1993), as well as "waters of the state" within the meaning of Section 13050(e) of the Water Code, Cal. Water Code § 13050(e).

72. The Southeast Bay Outfall, the shallow water outfall into Islais Creek, and each of the CSO Outfalls on the Bayside are each a "point source" within the meaning of 33 U.S.C. § 1362(14).

73. The Regional Water Board is the NPDES permitting authority for all discharge points for the Bayside System, including the CSO Outfalls, pursuant to 33 U.S.C. § 1342(b).

74. On May 8, 2013, the Regional Water Board reissued NPDES Permit No. CA0037664 through Order No. R2-2013-0029 (the "Bayside Permit") to the City. The Bayside Permit became effective on October 1, 2013 and was set to expire on September 30, 2018. However, the terms and conditions of the Bayside Permit continue pending issuance of a new permit, pursuant to Section 2235.4 of Title 23 of the California Code of Regulations. As of the date of the filing of this complaint, no new permit for the Bayside System has been issued.

75. At all times relevant to this Complaint, the Bayside Permit has authorized the City to discharge pollutants from the Bayside System, subject to conditions and limitations in the permit.

**Oceanside System and Oceanside Plant: Background and NPDES Permits**

76. In dry weather, the Oceanside System conveys wastewater flows to the Oceanside Plant, which provides secondary treatment, and discharges the treated wastewater through a deep water outfall to the Pacific Ocean approximately 3.5 miles offshore ("Southwest Ocean Outfall").

77. In wet weather, when combined sewage flows exceed Oceanside System storage, treatment, and pumping capacity, the City is permitted to discharge the excess combined sewage as CSOs through seven CSO Outfalls, subject to conditions, to the Pacific Ocean and Golden Gate Channel.

78. The Pacific Ocean at the discharge point for the Southwest Ocean Outfall is a "water of the United States" and a "navigable water," within the meaning of 33 U.S.C. § 1362(7) and 40 C.F.R. § 122.2 (1993), but is not a "water of the state" within the meaning of Section 13050(e) of the Water Code because it is more than three miles offshore.

79. The receiving waters for the Oceanside CSO outfalls, which comprise the Pacific Ocean and Golden Gate Channel, are all "waters of the United States" and "navigable waters," within the meaning of 33 U.S.C. § 1362(7) and 88 Fed. Reg. 61,964 (Sept. 8, 2023) (amending 88 Fed. Reg. 3004 (Jan. 18, 2023)) and are "waters of the state" within the meaning of Section 13050(e) of the Water Code, Cal. Water Code § 13050(e).

80. In 2009, EPA and the Regional Water Board, through Order No. R2-2009-0062, jointly issued NPDES Permit No. CA0037681 (the "2009 Oceanside Permit") to the City for discharges from the Oceanside System. The 2009 Oceanside Permit became effective on October 1, 2009 and its terms and conditions continued in force until 2019, pursuant to 40 C.F.R. § 122.6 and Cal. Code Regs., tit. 23, § 2235.4.

81. In September 2019, the Regional Water Board, through Order No. R2-2019-0028, reissued NPDES Permit No. CA0037681 (the "2019 State Oceanside Permit") to the City

for discharges from the Oceanside System. The 2019 State Oceanside Permit became effective on November 1, 2019.

82. In December 2019, EPA reissued NPDES Permit No. CA0037681 (the "2019 EPA Oceanside Permit") to the City for discharges from the Oceanside System. The 2019 EPA Oceanside Permit is identical to the 2019 State Oceanside Permit (together, the "2019 Oceanside Permit"). The 2019 Oceanside Permit remains in effect as of the filing of this Complaint.

83. The City petitioned EPA's Environmental Appeals Board ("EAB"), and later the Ninth Circuit, for review of the 2019 EPA Oceanside Permit pursuant to 40 C.F.R. § 124.19. As is relevant to this Complaint, the contested conditions included Section VI.C.5.a.ii.b – Reporting.

84. Pursuant to 40 C.F.R. § 124.60(b)(1) and (5), the uncontested conditions of the 2019 EPA Oceanside Permit became effective on March 9, 2020, which included, as relevant to this Complaint, conditions and limitations related to the operation and maintenance of the system and public notification requirements.

85. The EAB denied the petition for review, after which the contested terms became effective on February 1, 2021. 40 C.F.R. § 124.60(b)(1); *In re: City and County of San Francisco*, NPDES Appeal No. 20-01 Environmental Appeals Board (Dec. 1, 2020). The Ninth Circuit upheld the EAB's decision in 2023. *City and County of San Francisco v. U.S. Environmental Protection Agency*, 75 F.4th 1074 (9th Cir. 2023). The City has filed a petition for certiorari with the Supreme Court, seeking review of the Ninth Circuit's ruling on effluent limitations in the 2019 Oceanside Permit. *City and County of San Francisco v. U.S. Environmental Protection Agency*, petition for cert. pending, No. 23-753 (filed Jan. 8, 2024).

86. The City also challenged the 2019 State Oceanside Permit, including the contested provisions as well as additional claims, in the Superior Court of California, County of Alameda. By order of the state court, dated January 13, 2021, the state court proceedings are stayed and all terms and conditions of the 2019 State Oceanside Permit remain in force. *City and County of San Francisco v. San Francisco Bay Reg'l Water Quality Control Bd.*,

RG19042575 (Cal. Super. Ct. Jan. 13, 2021) (Order Following Joint Stipulation to Stay Proceedings).

87. The CWA authorizes EPA to enforce the terms and conditions of the 2019 State Oceanside Permit. 33 U.S.C. § 1342(i).

88. At all times relevant to this Complaint, the 2009 Oceanside Permit and the 2019 Oceanside Permit (together, the "Oceanside Permits") have authorized the City to discharge combined sewage from the Oceanside System outfalls described above, subject to conditions and limitations set forth in the permits.

**Additional NPDES Permit Provisions Applicable to All Permits**

89. The Bayside Permit and Oceanside Permits (together, the "NPDES Permits") each require the City to comply with conditions, including provisions related to: the effect of discharges on receiving waters; monitoring; reporting; public notification; and operation and maintenance. These conditions are contained in Attachments D, E, and G to the NPDES Permits. The conditions specific to NPDES permits authorizing CSOs are required by the CSO Policy, as incorporated by 33 U.S.C. § 1342(q).

90. The NPDES Permits each require the City to regularly perform monitoring of its compliance with the permits, including inspection of its pipes, pump stations, outfalls, and other components of its systems, and monitoring its discharges and their impacts on receiving waters.

91. The NPDES Permits each require the City to submit monthly Self-Monitoring Reports to the Regional Water Board. As part of those reports, among other requirements, the City must submit to the Regional Water Board all monitoring data collected since submission of the previous report. *See* Section VIII.B of Attachment E, Section V.C.1.a of Attachment G, Bayside Permit; Section IX.B of Attachment E, Section VI.C.1.a of Attachment G, Oceanside Permits.

92. The NPDES Permits each require an authorized representative of the City to sign each Self-Monitoring Report and certify the accuracy of the information submitted. NPDES Permits at Section V.B of Attachment D.

**EPA and State Inspections and Requests for Information**

93. On multiple occasions between 2015 and 2022, representatives of EPA, the State Water Board, or the Regional Water Board have inspected the Bayside and Oceanside Systems, including observing the physical condition of the systems; reviewing SFPUC's records on system maintenance, operation, and performance; and speaking with SFPUC staff.

94. Following those inspections, EPA requested additional information and documents from SFPUC regarding the combined sewer systems pursuant to 33 U.S.C. § 1318. SFPUC has provided information responsive to EPA's requests on numerous occasions.

95. The Bayside Permit and 2019 Oceanside Permit each include terms and conditions related to the reporting of releases, overflows, or diversions of combined sewage from the combined sewer systems into public areas or private property. Such a release is identified as an "Excursion" in the Bayside Permit and as a "Sewer Overflow from the Combined Sewer System" in the 2019 Oceanside Permit. For the purposes of this Complaint, both Excursions and Sewer Overflows from the Combined Sewer System are referred to as "Excursions".

96. On February 16, 2016, EPA issued a request for information to the City pursuant to Section 308(a) of the CWA, 33 U.S.C. § 1318(a), regarding its compliance with terms and conditions in the NPDES Permits related to Excursions.

97. Between March 7, 2016 and July 22, 2017, the City submitted information partially responsive to EPA's 2016 request, and it certified the accuracy of the information submitted to EPA.

98. On October 2, 2019, the Regional Administrator for EPA Region IX informed the City in writing that EPA had identified certain violations of the City's NPDES Permits and the CWA related to its operation of the combined sewer systems.

## <u>FIRST CLAIM FOR RELIEF</u>

**(Bayside Permit – CSOs Causing Exceedances of Water Quality Standards and Violations of Permit Limits)**

99. Paragraphs 1 through 98 are realleged and incorporated herein by reference.

100. The Bayside Permit prohibits the City's CSOs from causing a violation of any applicable water quality standard for receiving waters adopted by the Regional Water Board or EPA, as required by the CWA and regulations adopted thereunder. *See* Bayside Permit, Section V.C.

101. All Bayside CSOs discharge to San Francisco Bay or its tributaries, including Mission Creek and Islais Creek.

102. The Bayside Permit lists Mission Creek, Islais Creek, the Central Drainage Basin, the North Shore Drainage Basin, and the Southeast Drainage Basin as receiving waters for the City's CSOs. Bayside Permit, Table 2. Mission Creek and Islais Creek are identified as within the Central Drainage Basin. Crissy Field Beach is within the North Shore Drainage Basin.

103. A water quality standard consists of a beneficial use designation for a water body and an associated water quality objective to protect that use designation. 33 U.S.C. § 1313(c); 40 C.F.R. § 131. Water quality objectives can be numeric, such as a limit or level of constituents or pollutants, or narrative, such as a condition that a water body must meet. *Id.*

104. At all times relevant to this Complaint, the Regional Water Board and EPA have adopted water quality standards for San Francisco Bay and its tributaries, encompassing the receiving waters listed in Paragraph 102. The Regional Water Board set forth its standards in the San Francisco Bay Basin Water Quality Control Plan ("Basin Plan") and EPA set forth its standards in the California Toxics Rule, 40 C.F.R. § 131.38.

105. At all times relevant to this Complaint, Chapter 2 of the Basin Plan has identified the following beneficial uses, among others, for Lower San Francisco Bay, which includes Mission Creek, Islais Creek, and the Central Drainage Basin, and Central San Francisco Bay, which includes the North Shore Drainage Basin:

a. Water Contact Recreation, which includes, but is not limited to, swimming, wading, surfing and fishing; and

b. Estuarine Habitat for aquatic life use.

106. As relevant to the 2013 Bayside Permit, the Regional Water Board adopted, and EPA approved, numeric water quality objectives for bacteria to protect water contact recreation in Lower San Francisco Bay. Chapter 3, Basin Plan.

107. The Regional Water Board adopted, and EPA approved, numeric water quality objectives for un-ionized ammonia as nitrogen, to protect estuarine habitat and other aquatic life use in Lower San Francisco Bay and Central San Francisco Bay. Chapter 3, Basin Plan.

108. EPA adopted numeric water quality objectives for dissolved copper to protect aquatic life uses in the Lower San Francisco Bay and Central San Francisco Bay.

109. EPA has analyzed receiving water sampling data, CSO discharge monitoring data, and effluent sampling data for San Francisco Bay, including Mission Creek, Islais Creek, the Central Drainage Basin area near Crane Cove Park, and the North Shore Drainage Basin, including data collected, reported, and certified as accurate by the City, from November 1, 2013 to the present.

110. From November 1, 2013 to the present, the City's Bayside System CSOs caused exceedances of one or more bacteria objectives for protection of water contact recreation contained in the Basin Plan in Lower San Francisco Bay.

111. From November 20, 2013 to the present, the City's Bayside System CSOs caused exceedances of one or more dissolved copper objectives for protection of aquatic life contained in the Basin Plan in Lower San Francisco Bay and Central San Francisco Bay.

112. From November 20, 2013 to the present, the City's Bayside System CSOs caused exceedances of one or more un-ionized ammonia as nitrogen objectives for protection of aquatic life contained in the Basin Plan in Central San Francisco Bay.

113. Each exceedance of a water quality objective in Bayside System receiving waters caused by a CSO after October 1, 2013 is a separate violation of the Bayside Permit, Section V.C.

114. The Bayside Permit also requires that CSO discharges shall not cause floating, suspended, or deposited macroscopic particulate matter or foams; or alteration of temperature,

turbidity, or apparent color beyond present natural background levels to exist in receiving waters at any place outside the near-field mixing zone. *See* Bayside Permit, Section V.A.

115. Based on observations made by EPA representatives, between at least January 2021 and December 2023, the City's CSOs discharged materials that altered the coloration and the concentrations of floating material in Islais and Mission Creeks. For example, on December 30, 2023, an EPA representative observed increased turbidity, discoloration, scum, and floating material, including toilet paper, in Mission Creek outside the near-field mixing zone following a CSO event.

116. The City's Bayside System CSOs caused conditions of floating, suspended, or deposited macroscopic particulate matter or foams and alteration of turbidity, or apparent color beyond present natural background levels, outside the near-field mixing zone in Mission Creek and Islais Creek in violation of Section V.A of the Bayside Permit.

117. Each day that discharges from the City's Bayside System CSOs cause conditions of floating, suspended, or deposited macroscopic particulate matter or foams; or cause an alteration of turbidity, or apparent color, is a separate violation of the Bayside Permit, Section V.A.

118. The discharges from the Bayside System identified in Paragraphs 110, 111, 112, 115, and 116 were not in compliance with a NPDES Permit and are each also a violation of 33 U.S.C. § 1311(a).

119. Unless the City is enjoined by an order of the Court, Bayside System CSOs will continue discharging pollutants that cause violations of applicable water quality standards in San Francisco Bay or its tributaries in violation of the Bayside Permit.

120. As described in Paragraphs 45-49, for each violation referred to in this Claim for Relief, the United States and Regional Water Board are entitled to injunctive relief, as well as civil penalties.

**SECOND CLAIM FOR RELIEF**

**(Bayside Permit – Unauthorized Discharges)**

121. Paragraphs 1 through 98 are realleged and incorporated herein by reference.

122. The Bayside Permit prohibits any discharge of untreated or partially treated wastewater to waters of the United States not expressly authorized. *See* Bayside Permit, Section III.F.

123. Based on an analysis of the City's own data and on its own reporting, on multiple occasions from at least 2021 and continuing through the present day, the Bayside System discharged combined sewage, including untreated or partially treated wastewater, into streets and parks to San Francisco Bay through stormwater catch basins and other discrete conveyances, such as retaining wall gaps, near and around Marina Boulevard.

124. For example, the City reported that on October 24, 2021 and on or around December 31, 2022, the capacity of the combined sewer system in the Marina Boulevard and Marina Green area, between approximately Lyon Street and Filmore Street, was exceeded during storm events, resulting in 1.4 million gallons and 2.3 million gallons of combined sewage, respectively, flowing into separate stormwater catch basins that discharge directly to San Francisco Bay.

125. These discharges entered a busy marina, where people regularly boat, and occurred approximately half a mile from Crissy Field Beach, which is recreated year-round, including by swimmers.

126. The stormwater catch basins and other discrete conveyances each constitutes a "point source," within the meaning of 33 U.S.C. § 1362(14).

127. None of the discharges described in Paragraph 123 was authorized by the Bayside Permit.

128. Each unauthorized discharge of untreated or partially treated wastewater from the combined sewer system to waters of the United States from a point source is a separate violation of Section III.F of the Bayside Permit and Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a).

129. Unless the City is enjoined by an order of the Court, unauthorized discharges of untreated or partially treated combined sewage will continue.

130. As described in Paragraphs 45-49, for each violation referred to in this Claim for Relief, the United States and Regional Water Board are entitled to injunctive relief, as well as civil penalties.

**THIRD CLAIM FOR RELIEF**

**(Bayside and Oceanside Permits –**

**Violations of Operation and Maintenance Requirements)**

131. Paragraphs 1 through 98 are realleged and incorporated herein by reference.

General Violations of Operation and Maintenance Requirements

132. The City's NPDES Permits require that its "[c]ollection, treatment, storage, and disposal systems shall be operated in a manner that precludes public contact with wastewater, except in cases where excluding the public is infeasible, such as private property . . . ." NPDES Permits at Section I.I.2 of Attachment G.

133. In accordance with 40 C.F.R. § 122.41(e), the City's NPDES Permits contain the following standard condition: "The Discharger shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the Discharger to achieve compliance with the conditions of this [Permit] . . . ." NPDES Permits at Section I.D of Attachment D. One such condition in the Bayside Permit requires the City to "properly operate and maintain the collection system and the combined sewer discharge outfalls to reduce the magnitude, frequency, and duration of combined sewer discharges." Bayside Permit at Section VI.C.5.i(b). It must also "repair or replace, as necessary, sewers and related equipment." *Id*.

134. The 2009 Oceanside Permit also required the City to "operate and maintain its wastewater collection, treatment, and disposal facilities in a manner to ensure that all facilities are adequately staffed, supervised, financed, operated, maintained, repaired, and upgraded as necessary, in order to provide adequate and reliable transport, treatment, and disposal of all

wastewater from both existing and planned future wastewater sources under the Discharger's service responsibilities." 2009 Oceanside Permit Section VI.C.4.a.1.

135. Based on observations made by EPA representatives, the City's own information and reports, and information obtained by EPA and/or the Regional Water Board, at all times relevant to this Complaint, the City has failed to properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the City to achieve compliance with the conditions of its NPDES Permits, including collection, treatment, and disposal facilities.

136. Specifically, the City has failed to adequately assess the condition of, and undertake timely repair or replacement of, certain force mains, gravity sewer pipes, pump stations, CSD Structures and CSO Outfalls, and transport and storage structures, despite being aware that the infrastructure was leaking, past its useful life, or otherwise required replacement or repairs. For example, the City failed to act following a condition assessment in 2012 which revealed advanced corrosion and signs of failure in two of its final effluent force main pipes and recommended replacing the pipes within five years. Numerous leaks from both pipes discharged effluent into Islais Creek between July 2015 and at least January 2021. The City has been aware of the leaks since July 2015 and still has not replaced the pipes.

137. A 2011 report prepared by SFPUC entitled "Using a Risk-Based Approach to Planning Sewer Replacement in San Francisco" stated that the rehabilitation and replacement rate of sewer pipes in both systems at that time was not keeping pace with the failure rate. Further, the report noted that the actual number of pipes in the two systems that were in a failed state was unknown, due to a historically reactive maintenance system. SFPUC's 2012 "Combined Sewer Collection System Excursion Report" and its 2014, 2015, 2016, and 2017 "Bayside Combined Sewer System Excursions Annual Reports" all stated that the existing sewer replacement rate of four miles per year would result in full replacement of sewers once every 200 years, "which does not reflect the life expectancy of the system."

138. Following the 2015 inspection, the City sent EPA information on the open work orders for pipe repairs as of January 8, 2016. Based on this information, EPA identified 1,761

open work orders for pipe repairs. Of the open work orders, 72% were older than one year and 47% were more than two years old. The City reported 1,223 open work orders for pipe repairs as of April 24, 2018. During the 2022 inspection, the City also sent EPA information on the open work orders for pipe repairs as of February 28, 2022. Based on this information, EPA identified 532 open work orders for pipe repairs. Of the open work orders, 87% were older than one year and 79% were more than two years old. Of the 23 work orders that the City ranked as requiring urgent work to prevent a critical equipment failure, or an emergency, 26% were older than one year.

139. The City has also failed to operate certain facilities in both the Oceanside and Bayside Systems in accordance with specific wet weather operational requirements in the Permits, including, but not limited to, failing to operate facilities at the required flow rates or design capacities; failing to maximize treatment at wet weather facilities; or failing to operate the facilities at all, prior to discharging combined sewage from the Southeast Bay Outfall, the Southwest Ocean Outfall, or one of the CSO Outfalls. This means the City, at times, discharges combined sewage, which is not treated, to San Francisco Bay, its tributaries, or the Pacific Ocean when the City's systems had capacity to treat the combined sewage.

140. Based on the City's own information and reports, the City has not developed or implemented a plan for operating and maintaining the transport and storage structures that responds to their condition and is designed to prevent asset failure.

141. Based on the City's own information and reports, at certain times, the City's improper operation and maintenance of its combined sewer system has resulted in, or increased the volume of, CSOs; unauthorized discharges of combined sewage to waters; and Excursions of combined sewage from the combined sewer systems into basements, streets and sidewalks.

<u>Violations of Operation and Maintenance Requirements Related to the Channel Force Main</u>

142. A key component of the Bayside System is the Channel Force Main, a nearly two-mile concrete and steel pipe that conveys approximately 70% of the City's dry weather sewage flow to the Southeast Plant. The Channel Force Main is in continual use and there is no alternative collection system for that flow.

143. When a pipe is only partially filled with sewage, gases, such as hydrogen sulfide, can collect in the void above the sewage, which can lead to corrosion of, or damage to, concrete and steel.

144. In 2010, the City's consultants identified the Channel Force Main as "a serious point of vulnerability" in the Bayside System. The City's consultants further determined that failure of the Channel Force Main would "create an operational and public health emergency" and that failure during dry weather "could result in the discharge of raw or partially treated wastewater to San Francisco Bay" while failure during wet weather "would result in serious lowland flooding, major upstream backups and the possibility of discharge of raw wastewater to the Bay."

145. Based on the City's own information and reports, the City has failed to adequately assess the condition of the Channel Force Main, because the City has not taken the Channel Force Main out of service to adequately assess its condition, including its internal condition, and perform any needed maintenance.

146. Each day that the City fails to properly operate and maintain the Bayside and Oceanside facilities and systems of treatment and control (and related appurtenances) installed or used to achieve compliance with the conditions of the applicable NPDES Permit, including collection, treatment, and disposal facilities, is a violation of the general operation and maintenance provisions.

147. Unless enjoined by an order of the Court, the City will continue to violate the general operation and maintenance conditions of the Bayside and Oceanside Permits.

148. As described in Paragraphs 45-49, for each violation referred to in this Claim for Relief, the United States and Regional Water Board are entitled to injunctive relief, as well as civil penalties.

**FOURTH CLAIM FOR RELIEF**

**(Bayside and Oceanside Permits –**

**Violations of Public Notification Requirements)**

149. Paragraphs 1 through 98 are realleged and incorporated herein by reference.

150. The City is required by both the Bayside and Oceanside Permits to inform and notify the public of when and where CSOs or Excursions occur, particularly when the public could come into contact with combined sewage.

151. Compliance with public notification requirements is essential to alert the public about the risks present on beaches or other water contact areas while people are recreating and to prevent individuals from coming into contact with untreated sewage, which poses a risk of gastrointestinal illness; respiratory illness; and eye, ear, skin, and wound infections.

Violations of Public Notification Requirements related to CSOs

152. At all times relevant to this complaint, the NPDES Permits have required the City to inform the public of when and where CSOs occur. *See* Bayside Permit, Section VI.C.5.b.viii; 2009 Oceanside Permit, Section VI.C.6.b.8; and 2019 Oceanside Permit, Section VI.C.5.a.viii. The 2019 Oceanside Permit requires the City to affix permanent signs to CSO outfalls that are visible and legible from a distance of 50 feet onshore and offshore. 2019 Oceanside Permit, Section VI.C.5.a.viii(a).

153. Additionally, the City is required, and has been required at all times relevant to this Complaint, to post warning signs at beach locations where water contact recreation occurs whenever a CSO occurs that could affect recreational users at those locations. On the Oceanside, these signs must include "No Swimming" signs and "inform users that bacteria concentrations may be elevated." 2019 Oceanside Permit, Section VI.C.5.a.viii(b). Warning signs must be posted on the same day as the CSO if it occurs before 4:00 pm, otherwise the City is required to post the sign by 8:00 am the next day. *See* Bayside Permit, Section VI.C.5.b.viii; 2009 Oceanside Permit, Section VI.C.6.b.8; and 2019 Oceanside Permit, Section VI.C.5.a.viii.

154. Based on the observations of EPA representatives and on analysis of the City's own reporting, on numerous occasions between at least November 30, 2012 and the present, the City has failed to notify the public of the location and time of actual CSO occurrences from the Bayside and Oceanside systems, including by failing to affix permanent signs to all Oceanside CSO outfalls, failing to ensure that permanent signs on Oceanside CSO outfalls are visible and

legible from 50 feet onshore and offshore, and failing to timely post warning signs on public beaches where water contact recreation occurs on both the Bayside and Oceanside.

155. For example, Ocean Beach is a heavily recreated beach in San Francisco. There are three CSO outfalls located on the beach or near the beach that, at times, discharge untreated combined sewage across the beach to the Pacific Ocean. During the 2022-23 wet weather season, these outfalls discharged approximately 495 million gallons of combined sewage across the beach.

156. The permanent signs affixed to these CSO outfalls are not visible or legible from 50 feet both onshore and offshore, as required by the 2019 Oceanside Permit. The signs are small and, in some cases, are affixed to the outfall in such a way that persons cannot read the text.



*Figure 2: Photo of CSD-002 on Ocean Beach taken by EPA representative, December 20, 2023*

157. For example, an EPA inspector took the picture at Figure 2 on December 20, 2023, when combined sewage was discharging from the Vicente Street CSO Outfall (CSD 002). The permanent signs affixed to the outfall face outwards from the outfall platform, are small, and are far above eye-level. There are no signs on the sides of the outfalls to alert beachgoers that the discharge contains sewage. At the time this picture was taken, EPA inspectors observed people in the water and people fishing within one hundred feet of the CSO outfall.

158. The City also failed to post signs on Ocean Beach at times of CSO discharges that could affect recreational users during the 2022-23 wet weather season and the current wet weather season. Furthermore, when the City did post signs, those signs failed to inform recreators that the no swimming warnings were due to discharges of combined sewage or concerns regarding elevated bacteria concentrations. The signs did not inform the public of required information related to CSOs or adequately inform the public of the health risks posed by possible pathogens on the beach as required by the 2019 Oceanside Permit.

159. Each day that the City has failed to post a notice, or an adequate notice, of a CSO event that could affect a beach location where water contact recreation occurs is a violation of the applicable Permit.

<u>Violations of Public Notification Requirements Related to Excursions</u>

160. The NPDES Permits require the City to post warning signs if public contact with wastewater could reasonably occur on public property. *See* NPDES Permits, Attachment G, Section I.I.2.

161. Based on the observations of EPA representatives and on information obtained by EPA or the Regional Water Board, on numerous occasions between at least January 2017 and January 2023, the City failed to post warning signs where releases, overflows, backups, and unauthorized discharges of combined sewage has reached public property, including streets, where the public could come into contact with the wastewater.

162. For example, the City failed to post warning signs following releases, overflows, or backups of combined sewage onto streets, sidewalks, and properties at and near Cayuga

Avenue in the Mission Terrace neighborhood on January 20, 2017 or in the Marina Boulevard and Marina Green areas on October 24, 2021.

163. Each of the City's failures to post a warning sign if public contact with wastewater could reasonably occur on public property is a separate violation of the applicable NPDES Permit.

164. Unless enjoined by an order of the Court, the City will continue to violate the public notification provisions in the NPDES Permits.

165. As described in Paragraphs 45-49, for each violation referred to in this Claim for Relief, the United States and Regional Water Board are entitled to injunctive relief and civil penalties (including daily penalties for violations lasting more than a day).

## FIFTH CLAIM FOR RELIEF

**(Bayside and Oceanside Permits –**

**Violations of Recordkeeping and Reporting Requirements)**

166. Paragraphs 1 through 98 are realleged and incorporated herein by reference.

167. The Bayside Permit requires the City to develop and maintain a database containing specific information about each Excursion that occurs within the service area of the Southeast Plant, including, but not limited to, the location (including cross streets), the estimated volume in gallons, the date and time the Excursion was reported to SFPUC, the operator arrival date and time, the source of the Excursion, the cause of the Excursion, and corrective actions taken. *See* Bayside Permit, Section VI.C.4.c.ii(a). The Bayside Permit further requires the City to report any Excursion of more than 1,000 gallons to the Regional Water Board and the San Francisco Department of Public Health not later than two hours after becoming aware of the discharge. *See* Bayside Permit, Section VI.C.4.c.ii(b).

168. On multiple occasions, between at least December 3, 2014 and the present, the City failed to record either all required information or any required information regarding each Bayside System Excursion in its Excursion Database.

169. On multiple occasions, between at least December 3, 2014 and the present, the City failed to report Bayside System Excursions with a volume greater than 1,000 gallons to the Regional Water Board.

170. Since May 2020, the 2019 Oceanside Permit has required the City to enter information on all Oceanside Excursions (referred to in the Permit as Sewer Overflows from the Combined Sewer System) into the California Integrated Water Quality System ("CIWQS") online database, including all required database fields. *See* 2019 Oceanside Permit, Section VI.C.5.a.ii.(b)(1). Required database fields include location and volume estimate for the Excursion. *Id.*

171. On multiple occasions, between approximately June 13, 2020 and the present, the City failed to enter information for each Oceanside Excursion into the CIWQS Online SSO Database.

172. Each of the City's failures to fully report or record information in compliance with the requirements of the applicable NPDES Permit is a separate violation of the applicable NPDES Permit.

173. Unless enjoined by an order of the Court, the City will continue to violate the recordkeeping and reporting provisions in the NPDES Permits.

174. As described in Paragraphs 45-49, for each violation referred to in this Claim for Relief, the United States and Regional Water Board are entitled to injunctive relief and civil penalties (including daily penalties for violations lasting more than a day).

## SIXTH CLAIM FOR RELIEF

**(Bayside and Oceanside Permits –**

**Inadequate Contingency and Spill Prevention Plans)**

175. Paragraphs 1 through 98 are realleged and incorporated herein by reference.

176. Each of the applicable NPDES Permits, at Section I.C.1 of Attachment G, requires the City to maintain a Contingency Plan for each combined sewer system in order to ensure that existing facilities remain in, or are rapidly returned to, operation in the event of a process failure or emergency incident. The applicable NPDES Permits require the City to

include provisions in its Contingency Plans related to the following: emergency standby power; expeditious action to repair failures of, or damage to, equipment and sewer lines; and programs for maintenance, replacement and surveillance of physical condition of equipment, facilities, and sewer lines.

177. Each of the applicable NPDES Permits, at Section I.C.2 of Attachment G, requires the City to maintain a Spill Prevention Plan for each combined sewer system in order to prevent accidental discharges from the system and minimize the effects of such discharges. This provision requires the City to identify possible sources of accidental discharges, untreated or partially treated waste bypass, and polluted drainage; evaluate the effectiveness of present facilities and procedures; and predict the effectiveness of any proposed facilities and procedures and provide an implementation schedule containing interim and final dates when the proposed facilities and procedures will be constructed, implemented, or operational.

178. Each of the applicable NPDES Permits, at Section I.I.2 of Attachment G, requires that the City's "[c]ollection, treatment, storage, and disposal systems shall be operated in a manner that precludes public contact with wastewater, except in cases where excluding the public is infeasible, such as private property . . . ."

179. Upon request, the City submitted to EPA or the Regional Water Board on August 2013, June 2016, December 2018, and December 2023, versions of its Contingency Plans and Spill Prevention Plans.

180. From at least August 2013 to the present, the City's Contingency Plan failed to satisfy the requirements in Section I.C.1 of Attachment G to the applicable NPDES Permits, because it failed to include provisions related to emergency standby power; expeditious action to repair failures of, or damage to, equipment and sewer lines; or programs for maintenance of integral assets such as pump stations, gravity sewer mains, and force mains. For example, the City's December 2018 Contingency Plan does not describe any specific procedures to ensure that assets such as pump stations, gravity mains, or force mains are expeditiously repaired and returned to service. In addition, the 2018 Contingency Plan includes no specific procedures, whether through stockpiling of necessary physical resources to permit quick repairs or through

specific training, to prepare for different reasonably foreseeable failure scenarios, such as earthquakes, of the Channel Force Main, a critical asset so identified in the City's own planning documents because any failure has the potential to result in extended periods of large volumes of unpermitted discharges. The City's December 2023 Contingency Plan does not correct these deficiencies.

181. From at least August 2013 to the present, the City's Spill Prevention Plan failed to satisfy the requirements in Section I.C.2 of Attachment G to the applicable NPDES Permits, because it failed to identify possible sources of accidental discharge, untreated or partially treated waste bypass, and polluted drainage; failed to evaluate the effectiveness of present facilities and procedures and state when they became operational; and failed to predict the effectiveness of the proposed facilities and procedures, and provide an implementation schedule containing interim and final dates when the proposed facilities and procedures will be constructed, implemented, or operational.

182. From at least August 2013 to the present, the City's Contingency Plan failed to satisfy the requirements in Section I.I.2 of Attachment G to the applicable NPDES Permits because it did not contain adequate spill response measures to preclude public contact with wastewater. For example, the City's December 2023 Contingency Plan, which was self-identified as a document intended to satisfy the requirements of its NPDES Permits, contains no response actions to preclude public contact with wastewater caused by spills.

183. The City's failure to maintain a Spill Prevention Plan and a Contingency Plan that meet the requirements of its NPDES Permits for each combined sewer system is a violation of the applicable Permit for each day on which the plans failed to comply with such requirements.

184. Unless enjoined by an order of the Court, the City will continue to violate the provisions of its NPDES Permits relating to its Contingency Plan and its Spill Prevention Plan.

185. As described in Paragraphs 45-49, for each violation referred to in this Claim for Relief, the United States and Regional Water Board are entitled to injunctive relief, as well as civil penalties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the Regional Water Board, respectfully request that this Court grant the following relief:

a. Permanently enjoin the City from any further violations of the Clean Water Act and applicable NPDES Permits;

b. Order the City to expeditiously complete all actions necessary to ensure that it complies with the Clean Water Act and applicable NPDES Permits;

c. Order the City to pay a civil penalty to the United States of up to $37,500 per day for each violation occurring between January 12, 2009, and November 2, 2015 and pay a civil penalty to the United States of up to $66,712 per day per violation for violations that occurred on or after November 3, 2015;

d. Order the City to pay a civil penalty to the Regional Water Board of up to $25,000 per day for each violation and, where there is a discharge, $25 per gallon discharged and not cleaned up in excess of 1,000 gallons;

e. Assess a civil penalty against the City in favor of the Regional Water Board under Section 13385 of the Water Code;

f. Award the United States and the Regional Water Board their costs in this action;

g. Award the Regional Water Board its attorneys' fees and expert fees in this action, pursuant to California Code of Civil Procedure Section 1021.8; and

h. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

By: [signature]
SHEILA MCANANEY (ILBN 6309635)

BRIAN D. SCHAAP (DCBN 1780655)
SAMANTHA M. RICCI (CABN 324517)
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044
MARK C. ELMER (DCBN 453066)
Senior Counsel
Environmental Enforcement Section
999 18th St., South Terrae, Suite 370
Denver, CO 80202
Telephone: (202) 616-6535 (McAnaney)
E-mail: sheila.mcananey@usdoj.gov

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

By: Michael T. Pyle
MICHAEL T. PYLE (CABN 172954)
EKTA DHARIA (NYRN 5219860)
Assistant United States Attorneys
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7276
Email: Ekta.Dharia@usdoj.gov

OF COUNSEL:

KIMBERLY WELLS
DARON RAVENBORG
ERIN BREWER
Assistant Regional Counsels
U.S. Environmental Protection Agency, Region IX
CHRISNA BAPTISTA
Attorney-Advisor
U.S. Environmental Protection Agency,
Office of Enforcement and Compliance Assurance

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
BRYANT B. CANNON
Deputy Attorney General

By: ______________________________
MARC N. MELNICK (SBN 168187)
Deputy Attorney General
Email: Marc.Melnick@doj.ca.gov
1515 Clay Street, 20the Floor
P.O. Box 70550
Oakland, CA 94612
Telephone: (510) 879-0750

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the other signatories above.

Dated: April 26, 2024

*/s/ Sheila McAnaney*

Sheila McAnaney