Eric J. Buescher (Bar No. 271323)
Nicole C. Sasaki (Bar No. 298736)
**SAN FRANCISCO BAYKEEPER**
1736 Franklin Street, Suite 800
Oakland, California 94612
Telephone: (510) 735-9700
Facsimile: (510) 735-9160
Email: eric@baykeeper.org
Email: nicole@baykeeper.org

Daniel Cooper (Bar No. 153576)
Jessica Hollinger (Bar No. 344211)
Kristina Hambley (Bar No. 352499)
**SYCAMORE LAW, INC.**
1004-B O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 360-2962
Email: daniel@sycamore.law
Email: jessica@sycamore.law
Email: kristina@sycamore.law

*Attorneys for Plaintiff-Intervenor*
*SAN FRANCISCO BAYKEEPER*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and PEOPLE OF THE STATE OF CALIFORNIA by and through CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO BAY REGION,<br><br>    Plaintiffs,<br><br>SAN FRANCISCO BAYKEEPER, a California non-profit corporation,<br><br>    Plaintiff-Intervenor,<br><br>        v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant. | Civil Case No.: 3:24-cv-02594-AMO<br><br>**COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.***<br><br><br>Complaint Filed:      May 1, 2024<br><br>Judge:      Hon. Araceli Martinez-Olguin |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 4

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    PARTIES ............................................................................................................. 5

    A.      San Francisco Baykeeper ......................................................................... 5

    B.      Government Plaintiffs ............................................................................... 7

    C.      The City and County of San Francisco ..................................................... 7

IV.     LEGAL BACKGROUND .................................................................................... 8

    A.      The Clean Water Act ................................................................................. 8

    B.      CSO Control Policy ................................................................................. 10

    C.      The City and SFPUC's NPDES Permits ................................................. 11

        1.      SFPUC's Bayside NPDES Permit ............................................... 11

        2.      SFPUC's Oceanside NPDES Permit ........................................... 14

    D.      The Receiving Waters .............................................................................. 16

V.      FACTUAL BACKGROUND ............................................................................. 20

    A.      The City's Combined Sewer Systems ..................................................... 20

    B.      Impacts to the Receiving Waters from the City and SFPUC's Clean Water Act
        Violations ................................................................................................. 25

    C.      The City and SFPUC's Violations of the Bayside Clean Water Act Permit ................. 29

        1.      Discharge Prohibition A .............................................................. 29

        2.      Discharge Prohibition C .............................................................. 31

        3.      Discharge Prohibition D .............................................................. 31

        4.      Discharge Prohibition F ............................................................... 32

        5.      Receiving Water Limitation A ..................................................... 33

        6.      Receiving Water Limitation C ..................................................... 34

        7.      Nine Minimum Controls .............................................................. 35

        8.      Long-Term Control Plan .............................................................. 36

        9.      Monitoring and Reporting Requirements ..................................... 39

10. Public Notification Requirements ......................................................... 39

D. The City and SFPUC's Violations of its Oceanside Clean Water Act Permit ................ 40

1. Discharge Prohibition B ........................................................... 40

2. Discharge Prohibition D ........................................................... 40

3. Nine Minimum Controls ........................................................... 41

4. Long-Term Control Plan ........................................................... 42

5. Monitoring and Reporting Requirements ............................................ 43

6. Public Notification Requirements .................................................. 43

VI. CAUSES OF ACTION .......................................................................... 45

FIRST CAUSE OF ACTION
Prohibited Discharges, Bayside Permit and Clean Water Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f)) .............................................. 45

SECOND CAUSE OF ACTION
Violations of Receiving Water Limitations, Bayside Permit and Clean Water Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f)) .............................................. 47

THIRD CAUSE OF ACTION
Prohibited Discharges, Oceanside Permit and Clean Water Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f)) .............................................. 49

FOURTH CAUSE OF ACTION
Unpermitted Combined Sewer Overflow Discharges
Bayside and Oceanside Permits and Clean Water Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f)) .............................................. 51

FIFTH CAUSE OF ACTION
Violations of Monitoring, Recordkeeping, and Reporting Requirements,
Bayside and Oceanside Permits and Clean Water Act
(33 U.S.C. §§ 1342, 1365(a) and 1365(f)) ................................................... 54

SIXTH CAUSE OF ACTION
Violations of Public Notification Requirements,
Bayside and Oceanside Permits and Clean Water Act
(33 U.S.C. §§ 1342, 1365(a) and 1365(f)) ................................................... 55

VII. PRAYER FOR RELIEF ........................................................................ 56

San Francisco Baykeeper ("Baykeeper"), by and through its counsel, hereby alleges:

## I.   <u>INTRODUCTION</u>

1.     This complaint in intervention is brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act"), to address the repeated and ongoing unlawful discharge of untreated sewage into San Francisco Bay, Mission Creek, Islais Creek, the Pacific Ocean, and other waters of the United States by the City and County of San Francisco (the "City") and its Public Utilities Commission ("SFPUC").

2.     The United States of America ("the United States"), by the authority of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the People of the State of California by and through the California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Water Board") (collectively, "Government Plaintiffs") filed this lawsuit, alleging repeated violations of the Clean Water Act and California law.[1] *See* Dkt. No. 1, Compl. at 3, ¶¶ 1, 3, 4.

3.     Baykeeper seeks to intervene as a plaintiff in this action, pursuant to section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B), which authorizes any citizen to intervene as a matter of right in any ongoing civil action brought by the EPA to require compliance with a standard, limitation, or order under the Clean Water Act.

4.     Baykeeper seeks redress for SFPUC's ongoing violations of the Clean Water Act and the National Pollution Discharge Elimination System ("NPDES") permits issued thereunder, including but not limited to: unlawful discharges to San Francisco Bay, Mission Creek, Islais Creek, and the Pacific Ocean (the "Receiving Waters"); violations of water quality standards; failure to comply with the federal Combined Sewer Overflow Control Policy as implemented by the Bayside and Oceanside Permits; and failure to revise operating protocols as necessary to comply with applicable Clean Water Act permits.

---

[1] The Regional Water Board joined this action as a plaintiff pursuant to 33 U.S.C. § 1319(e).

1

**II.     JURISDICTION AND VENUE**

2

5.     This Court has subject matter jurisdiction over the parties and this action pursuant to 33

3

U.S.C. §§ 1319(b) and 1365(a)(1), 28 U.S.C. §§ 1331, 1345, 1355, 1367(a), and 2201.

4

6.     Venue is proper as the City is located, and the source of the violations occurred, within

5

the Northern District of California. *See* 33 U.S.C. §§ 1319(b) and 1365(c)(1), and 28 U.S.C. §§ 1391(b)

6

and 1397.

7

**III.     PARTIES**

8

**A.     San Francisco Baykeeper**

9

7.     Plaintiff-Intervenor Baykeeper is a non-profit public benefit corporation organized under

10

the laws of the State of California. Baykeeper's mission is to protect San Francisco Bay from the

11

biggest threats and hold polluters accountable.  Baykeeper patrols on the water, investigates and stops

12

polluters, and strengthens laws that protect the Bay.  Baykeeper is dedicated to preserving, protecting,

13

and defending the environment, wildlife, and natural resources of San Francisco Bay and its tributaries

14

for the benefit of its ecosystems and communities. Baykeeper furthers its goals through education,

15

advocacy, restoration, and directly initiates enforcement of environmental laws on behalf of itself and

16

its members.

17

8.     Baykeeper's office is located at 1736 Franklin Street, Suite 800, Oakland, California

18

94612.

19

9.     Baykeeper has over 5,000 members who use and enjoy San Francisco Bay, its

20

tributaries, and other waters for various recreational, educational, scientific, conservation, aesthetic,

21

spiritual, and other purposes.

22

10.     Baykeeper's members, including citizens, taxpayers, property owners, and residents,

23

live, work, and travel near, and recreate in, San Francisco Bay and its tributaries and recreate in or near

24

the Bay shoreline and Receiving Waters into which SFPUC discharges pollutants, including, but not

25

limited to, San Francisco Bay, the Pacific Ocean, Mission Creek, and Islais Creek.

26

11.     Baykeeper's members use and enjoy the Receiving Waters and the adjacent areas to the

27

waters to sail, swim, windsurf, stand up paddleboard, picnic, fish, and hike; to conduct scientific study

28

and research; for aesthetic enjoyment, and to enjoy wildlife.

12.     SFPUC's failure to comply with the substantive requirements of its Clean Water Act permits, the federal Combined Sewer Overflow Policy ("CSO Policy"), and the Clean Water Act, including but not limited to SFPUC's discharge of raw sewage to the Receiving Waters and pollutants which cause violations of numeric bacteria water quality standards in Mission Creek, Islais Creek, and San Francisco Bay, among others, negatively impacts and impairs Baykeeper's members' use and enjoyment of the Receiving Waters and the adjacent areas.

13.     Combined Sewage Overflows ("CSOs," also called "Combined Sewage Discharges") often contain high levels of suspended solids, pathogenic microorganisms, toxic pollutants, floatables, nutrients, oxygen-demanding organic compounds, oil and grease, and other pollutants which may pose risks to human health and threaten aquatic life and its habitat.

14.     The interests of Baykeeper's members have been, are being, and will continue to be adversely affected by the City's failure to comply with the Clean Water Act and its associated permits. The relief sought herein will redress the harms to Baykeeper caused by the City's activities.

15.     For more than twenty years, Baykeeper has campaigned to reduce sewage pollution into the Bay from wastewater treatment facilities, including requiring municipalities to fix and upgrade their stormwater and sanitary sewage infrastructure to reduce sanitary sewer overflows as well as urban runoff pollution into the Bay.

16.     On March 6, 2024, Baykeeper provided notice of intent to file suit against the City and SFPUC for its violations of the Clean Water Act ("Notice Letter") pursuant to 33 U.S.C. § 1365(b) related to the Bayside system. The Notice Letter is attached as Exhibit 1 and is incorporated herein by reference.

17.     Baykeeper sent the Notice Letter to the owners and operators of the City's combined storm and sewer system. Baykeeper also sent a copy of the Notice Letter to the Administrator of the EPA, the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Board (collectively, "State and Federal agencies"), as required by section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

18.     On May 1, 2024, Government Plaintiffs filed this lawsuit.

19.     Intervention in this action is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

20.     Continuing commission of the acts and omissions alleged herein will irreparably harm Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

21.     Baykeeper has one or more members who use, explore, and recreate in areas impacted by the stormwater pollution herein at issue and could sue in their own right.  Some of Baykeeper's members will suffer recreational, aesthetic, or other environmental injuries due to the City's and SFPUC's pollution.  Baykeeper's members use and enjoy the Pacific Ocean, San Francisco Bay, Mission Creek, and Islais Creek for recreational, scientific, and aesthetic purposes and would reasonably cease or limit these activities when and should water quality become too degraded. Baykeeper's injuries-in-fact are fairly traceable to the City's and SFPUC's conduct and would be redressed by the requested relief.

22.     Neither the claims brought by Baykeeper nor the relief Baykeeper requests requires the participation of individual members.

**B.     Government Plaintiffs**

23.     Upon information and belief, Plaintiff United States is acting on behalf of the EPA Administrator.

24.     Upon information and belief, Plaintiff Regional Water Board is acting pursuant to its responsibility under state law to ensure compliance with state and federal water quality standards.

25.     Upon information and belief, both the Attorney General of the United States and the Attorney General of the State of California have authority to bring this lawsuit.

**C.     The City and County of San Francisco**

26.     The City is a political subdivision of the state of California.

27.     SFPUC is a department of the City.

28.     The City, through SFPUC, owns, controls, operates, and is responsible for its combined sewer systems.

29.     The City's combined sewer systems collect both stormwater and runoff along with wastewater from residential, commercial, industrial, and other sources within the City. This combined

sewage contains substantial amounts of harmful pollutants, waste, trash, and other material which must be transported to wastewater treatment plants for proper treatment in order to ensure the discharge does not the impair or harm receiving waters.

## IV.   LEGAL BACKGROUND

### A.   The Clean Water Act

30.     Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" for violations of NPDES permit requirements and for unpermitted discharges of pollutants. *See* 33 U.S.C. §§ 1365(a)(i), 1365(f). The City is a "person" within the meaning of section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

31.     The City is a "municipality" within the meaning of section 502(4) of the Clean Water Act, 33 U.S.C. § 1362(4).

32.     An action for injunctive relief is authorized under section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a).

33.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $66,712 per day for violations occurring after November 3, 2015. *See* 33 U.S.C. § 1319(d).

34.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties, including an intervenor plaintiff, to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

35.     The Clean Water Act was passed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The stated goal of the law was to eliminate the discharge of pollutants to the country's waterways.

36.     To do so, the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the Clean Water Act. 33 U.S.C. § 1311(a). Specifically, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342.

37.     The Clean Water Act is a strict liability statute. To establish liability under section 301 of the Clean Water Act, Baykeeper must only establish that the City and SFPUC have (i) discharged (ii)

a pollutant (iii) to navigable waters (iv) from a point source (v) in violation of an NPDES permit. *See Comm. To Save Mokelumne River v. E. Bay Mun. Util. Dist.,* 13 F.3d 305, 308 (9th Cir. 1993), *cert. denied*, 513 U.S. 873 (1994); *Nat'l Wildlife Fed. v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982).

38.    The "discharge of a pollutant" means, among other things, the addition of a pollutant to "waters of the United States" from any "point source." 33 U.S.C. § 1362(12); 40 C.F.R. § 122.2.

39.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2.

40.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

41.    The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); 40 C.F.R. § 122.2.

42.    Compliance with the Bayside and Oceanside Permits[2] constitutes compliance with the Clean Water Act. 33 U.S.C. § 1342(k). Conversely, a permittee that fails to comply with the terms and conditions of its permit is liable for violations of the Clean Water Act. *Nw. Env't Advocs. v. City of Portland*, 56 F.3d 979, 988, 986 (9th Cir. 1995) ("[T]he plain language [of the Clean Water Act] authorizes citizens to enforce *all* permit conditions." (emphasis in original)); *Ecological Rights Found.*

---

[2] In addition to the Bayside Permit, discharges from the Bayside Facilities are also regulated under NPDES Permit No. CA0038849, which establishes requirements on mercury and polychlorinated biphenyls (PCBs) from wastewater discharges to San Francisco Bay, as well as NPDES Permit No. CA0038873, which establishes requirements on nutrients for the entire SFPUC combined sewer system. Neither of these permits is at issue here.

*v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural."); *see also* Bayside Permit at § III.F ("Any sanitary or combined sewer discharge of untreated or partially-treated wastewater to waters of the United States not expressly [sic] authorized by this Order is prohibited.")

43.     Each violation of any term or condition of the Bayside or Oceanside Permit is an independent violation of the Clean Water Act. 33 U.S.C. § 1319(d).

44.     Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater.

45.     In California, the State Board and its nine Regional Water Boards have approval from EPA to administer its NPDES permit program for the State. Under this authority, the State Board and Regional Water Boards issue NPDES permits in the State to regulate water pollutant discharges.

**B.     CSO Control Policy**

46.     In 2000, the Wet Weather Water Quality Act mandated that "[e]ach permit . . . for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy." 33 U.S.C. § 1342(q)(1). The CSO Policy requires municipalities with combined sewer systems to identify and implement combined sewer overflow controls which will achieve compliance with water quality standards in order to protect the designated beneficial uses of the receiving waters for these discharges.

47.     The CSO Control Policy prohibits any CSO in dry weather and sets limits on wet weather CSOs to protect the beneficial uses of receiving waters.

48.     The CSO Control Policy's technology-based requirements for wet weather discharges focus around "nine minimum control measures": (1) Proper operation and regular maintenance programs for the sewer system; (2) Maximum use of the collection system for storage; (3) Review and modification of pretreatment requirements to assure CSO impacts are minimized; (4) Maximization of flow to Publicly Owned Treatment Works ("POTW") for treatment; (5) Prohibition of dry weather CSOs; (6) Control of solid and floatable materials in CSOs; (7) Pollution prevention; (8) Public

notification of CSO occurrences and impacts, and (9) Monitoring to effectively characterize CSO impacts and the efficacy of CSO controls. *See* 59 Fed. Reg. 18689 at 18691.

49.     In addition, the CSO Control Policy requires municipalities to develop a "Long Term CSO Control Plan" "that will ultimately result in compliance with the requirements of the CWA." 59 Fed. Reg. 18689 at 18691.

**C.     The City and SFPUC's NPDES Permits**

50.     The City owns and operates two separately permitted combined sewer systems, the "Oceanside Facilities" and the "Bayside Facilities." Both collect, store, transport, treat, and discharge combined sewage.

*1.     SFPUC's Bayside NPDES Permit*

51.     The San Francisco Bay portion of SFPUC's combined system is covered by NPDES Permit No. CA0037664, San Francisco Bay Regional Water Quality Control Board Order No. R2-2013-0029 (issued on August 14, 2013) (the "Bayside Permit") which regulates discharges from the Southeast Water Pollution Control Plant, North Point Wet Weather Facility, Bayside Wet Weather Facilities, and Wastewater Collection System to waters of the United States, pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342. The City is the owner and operator of the Bayside Facilities and is subject to the terms and conditions of the Bayside Permit. *See* Bayside Permit, Attach. F, Fact Sheet at F-3 to F-4. Violation of the Bayside Permit terms and conditions constitutes violation of the Clean Water Act.

52.     The Bayside Permit includes discharge prohibitions, receiving water limitations, combined sewer controls and requirements, monitoring and reporting requirements, and public disclosure and notice requirements.

53.     Discharge Prohibition A prohibits any discharge of untreated or partially-treated wastewater to waters of the United States except as expressly authorized in the Bayside Permit.

54.     Discharge Prohibition C prohibits bypass of untreated or partially-treated wastewater to waters of the United States except during wet weather and as provided in the Bayside Permit.

55.     Discharge Prohibition D prohibits any dry weather discharges from Discharge Point Nos. 002 through 043.

56.     Discharge Prohibition F prohibits any discharge of treated wastewater in any location or manner different from that described in the Bayside Permit. *See* Bayside Permit at § III.F.

57.     Receiving Water Limitation A prohibits any discharge that causes certain conditions, including floating, suspended or deposited macroscopic particulate matter or foams, alteration of temperature, turbidity, or color, and "toxic or other deleterious substances," to exist in receiving waters outside the "near-field mixing zone." Bayside Permit at § V.A.

58.     Receiving Water Limitation C prohibits any discharge that causes "a violation of any water quality standard for receiving waters outside near-field mixing zones (i.e., where mixing is not controlled by effluent discharge momentum and buoyancy)." Bayside Permit at § V.C.

59.     The Bayside Permit implements the CSO Policy for the Bayside Facilities. *See* Bayside Permit at Attach. F, Fact Sheet at F-15.

60.     The Combined Sewer System Controls require the Bayside Facilities to "maximize flows to the Southeast Plant and pollutant removal during wet weather in accordance with the Nine Minimum Controls and the Discharger's Long-Term Control Plan," and specify performance criteria and monitoring requirements for wet weather combined sewer system operations consistent with their implementation. Bayside Permit at § VI.C.5, and Attach. F, Fact Sheet at F-42.

61.     The City and SFPUC must also implement the Long-Term Control Plan and revise it "as necessary to ensure compliance with the Nine Minimum Controls and the Long-Term Control Plan requirements of the Combined Sewer Overflow Control Policy." Bayside Permit at § VI.C.5.a, Attach. F, Fact Sheet at F-42. The Bayside Permit's "Long Term Control Plan" term requires "capture for treatment, or storage and subsequent treatment, [of] 100 percent of the combined sewage flow collected in the combined sewage system during precipitation events" for secondary treatment, equivalent-to-primary treatment, or primary treatment. Bayside Permit at § VI.C.5.c.iii. "Primary Clarification," as described in the CSO Control Policy, requires removal of "floatables and settleable solids." 59 Fed. Reg. 18693.

62.     The Bayside Permit requires the City to comply with provisions related to monitoring, reporting, and public notification contained in Attachments D, E, and G, as well as the CSO Control Policy.

63. The Bayside Permit requires the City to regularly perform monitoring of its compliance with the permits, including inspection of its pipes, pump stations, outfalls, and other components of its systems, and monitoring its discharges and their impacts on receiving waters.

64. The Bayside Permit requires the City to submit monthly Self-Monitoring Reports to the Regional Water Board. As part of those reports, among other requirements, the City must submit to the Regional Water Board all monitoring data collected since submission of the previous report. *See* Bayside Permit, Attach. E at E-13 to E-16, Attach. G at G-14 to G-15. The Bayside Permit requires an authorized representative of the City to sign each Self-Monitoring Report and certify the accuracy of the information submitted. *See id.*, Attach. D at D-5 to D-7.

65. The Bayside Permit requires a database with specific information about each Excursion that occurs within the service area of the Southeast Plant. This information includes, but is not necessarily limited to, the location, the estimated volume in gallons, the date and time the Excursion was reported to SFPUC, the operator arrival date and time, the source, the cause, and the corrective actions taken by SFPUC. *See* Bayside Permit § VI.C.4.c.ii(a).

66. The Bayside Permit requires the City to report any Excursion of more than 1,000 gallons to the Regional Water Board and the San Francisco Department of Public Health not later than two hours after becoming aware of it. *See* Bayside Permit § VI.C.4.c.ii(b).

67. The Bayside Permit requires the City to inform and notify the public of when and where CSOs or Excursions occur, especially when the public may contact sewage discharges. *See* Bayside Permit § VI.C.5.b.viii.

68. The City is required to post warning signs at beach or waterway locations where water contact recreation occurs whenever a CSO occurs that could affect recreational users at those locations. These warnings, essential to alert the public about risks on beaches and in waterways, must be posted on the same day as the CSO if it occurs before 4:00 pm, or by 8:00 am the next day if it occurs later than 4:00 pm. *See* Bayside Permit § VI.C.5.b.viii.

69. Compliance with public notification requirements of the Bayside Permit is vital to protect individuals from coming into contact with untreated sewage, which poses a risk of gastrointestinal illness, respiratory illness, and eye, ear, skin, and wound infections.

2. *SFPUC's Oceanside NPDES Permit*

70. The oceanside portion of SFPUC's combined system is covered under NPDES Permit No. CA0037681, San Francisco Bay Regional Water Quality Control Board Order No. R2-2019-0028 (issued September 11, 2019) ("Oceanside Permit"). The City is the owner and operator of the Oceanside Facilities and is subject to the terms and conditions of the Oceanside Permit. *See* Oceanside Permit, Attach. F, Fact Sheet at F-3 to F-4. Violation of the Oceanside Permit's terms and conditions constitutes violation of the Clean Water Act.

71. The Oceanside Permit includes discharge prohibitions, receiving water limitations, combined sewer controls and requirements, monitoring and reporting requirements, and public disclosure and notice requirements.

72. Discharge Prohibition B prohibits bypass of untreated or partially-treated wastewater to waters of the United States except during wet weather and as provided in the Oceanside Permit. *See* Oceanside Permit § III.B.

73. Discharge Prohibition D prohibits any discharge to a water of the United States from any location other than Discharge Point No. 001, except from Discharge Point Nos. CSD-001, CSD-002, CSD-003, CSD-004, CSD-005, CSD-006, and CSD-007 during wet weather. *See* Oceanside Permit § III.D.

74. The Receiving Water Limitations prohibit any discharge that "cause[s] or contribute[s] to a violation of any applicable water quality standard." Oceanside Permit at § V.

75. The Oceanside Permit implements the CSO Policy for the Oceanside Facilities. *See* Oceanside Permit, Attach. F, Fact Sheet at F-12 to F-13.

76. The Combined Sewer System Controls specify performance criteria and monitoring requirements for wet weather combined sewer system operations consistent with their implementation. *See* Oceanside Permit at § VI.C.5, Attach. F, Fact Sheet at F-29 to F-31.

77. The Oceanside Permit's "Long Term Control Plan" term requires "capture for treatment, or storage and subsequent treatment, [of] 100 percent of the combined wastewater and stormwater flow collected in the combined sewer system during precipitation events" for secondary treatment,

equivalent-to-primary treatment, primary treatment, or reverse osmosis. Oceanside Permit at § VI.C.5.c.iii.

78.     The Oceanside Permit requires the City to comply with provisions related to monitoring, reporting, and public notification contained in Attachments D, E, and G, as well as the CSO Control Policy.

79.     The Oceanside Permit requires the City to regularly perform monitoring of its compliance with the permits, including inspection of its pipes, pump stations, outfalls, and other components of its systems, and monitoring its discharges and their impacts on receiving waters.

80.     The Oceanside Permit requires the City to submit monthly Self-Monitoring Reports to the Regional Water Board. As part of those reports, among other requirements, the City must submit to the Regional Water Board all monitoring data collected since submission of the previous report. *See* Oceanside Permit, Attach. E at E-21 to E-13, Attach. G at G-8 to G-11.

81.     The Oceanside Permit requires an authorized representative of the City to sign each Self-Monitoring Report and certify the accuracy of the information submitted. *See id.*, Attach. D at D-5 to D-7.

82.     The Oceanside Permit requires the City to enter information on all Oceanside Excursions (referred to in the Permit as Sewer Overflows from the Combined Sewer System) into the California Integrated Water Quality System ("CIWQS") online database, including all required database fields. *See* Oceanside Permit § VI.C.5.a.ii.(b)(1).

83.     The City is required to post warning signs at beach or waterway locations where water contact recreation occurs whenever a CSO occurs that could affect recreational users at those locations. *See* Oceanside Permit, § VI.C.5.a.viii. Warning signs must include "No Swimming" signs and "inform users that bacteria concentrations may be elevated." *See id.*, § VI.C.5.a.viii(b).

84.     These warnings, essential to alert the public about risks on beaches and in waterways, must be posted on the same day as the CSO if it occurs before 4:00 pm, or by 8:00 am the next day if it occurs later than 4:00 pm. *See* Oceanside Permit at § VI.C.5.a.viii.

85.     The Oceanside Permit also requires the City to affix permanent signs to CSO outfalls that are visible and legible from a distance of 50 feet onshore and offshore. *See* Oceanside Permit § VI.C.5.a.viii(a).

86.     Compliance with public notification requirements of the Oceanside Permit is vital to protect individuals from coming into contact with untreated sewage, which poses a risk of gastrointestinal illness, respiratory illness, and eye, ear, skin, and wound infections.

### D.     The Receiving Waters

87.     The combined sewer system pipes and other conveyances from the Bayside Facilities discharge to the Central and Lower San Francisco Bay, Mission Creek Channel, Islais Creek Channel, and other local waterbodies. These Receiving Waters are waters of the United States within the San Francisco Bay watershed. *See* Bayside Permit, Attach. F, Fact Sheet, at F-4.

88.     San Francisco Bay is an ecologically-sensitive waterbody and a defining feature of Northern California. San Francisco Bay is an important and heavily-used resource, with special aesthetic and recreational significance for people living in the surrounding communities. Aquatic sports are very popular in the Bay Area. The San Francisco Bay shoreline has numerous highly-valued beaches with public access that offer unique recreational opportunities for swimmers, kayakers, stand up paddleboarders, and windsurfers. The large-scale urbanization of the Bay Area makes these recreational and aesthetic uses critically important to the quality of life of Bay Area residents. Unfortunately, sewage spills and combined sewage overflows render San Francisco Bay's coastal resources inaccessible and/or hazardous for human contact or non-contact recreation for significant periods every year.

89.     Further, San Francisco Bay's water quality is impaired and continues to decline. Central and Lower San Francisco Bay are both impaired for chlordane, DDT (dichlorodiphenyltrichloroethane), dieldrin, dioxin compounds, furan compounds, invasive species, mercury, PCBs (polychlorinated biphenyls), and trash; Central San Francisco Bay is further impaired for selenium. San Francisco Bay's once-abundant and varied fisheries have been drastically diminished by pollution, and much of the wildlife habitat of San Francisco Bay has been degraded.

90.     Mission Creek is a dredged channel that runs approximately 2/3 mile between San Francisco Bay at Oracle Park and the start of Interstate 280 at Seventh Street to the southwest, fed by a freshwater culvert originating at headwaters in the Castro District. The Creek abuts five wastewater pump stations and six combined sewer discharge outfalls. Mission Creek borders Oracle Park and its adjacent ferry terminal, China Basin Park, a Bay Area Water Trail kayak and small boat launch, and a continuous Shoreline Park, which contain walking paths, picnic areas, an amphitheater, sports courts, and a dog park. Mission Creek hosts approximately 20 houseboats and is a popular area for water recreation activities. A wetland mitigation area near the kayak launch provides ecologically important habitat, and Mission Creek is also considered potential habitat for herring and shoreline wetland species. Again, sewage spills and combined sewage overflows render Mission Creek hazardous for human contact or non-contact recreation for significant periods every year. Further, Mission Creek is impaired for ammonia, chlordane, dieldrin, hydrogen sulfide, lead, mercury, PAHs (polycyclic aromatic hydrocarbons), PCBs (polychlorinated biphenyls), silver, and zinc, all commonly found in raw sewage.

91.     Islais Creek Channel is an approximately one mile long, east-west estuary connecting Central San Francisco Bay at Pier 84 and mostly underground freshwater culverts originating from Upper Islais Creek in Glen Park Canyon and Precita Creek in Diamond Heights. The Channel abuts the Southeast Wastewater Treatment Plant. Islais Creek was once San Francisco's largest freshwater body prior to extensive land reclamation, and the Channel continues to serve as a salt marsh and marine habitat to many aquatic species, including fish, marine mammals, vegetation, and over 168 species of birds. The Channel's shoreline hosts numerous small parks and walking trails, as well as a Bay Water Trail kayak and small boat launch. As with other waters impacted by discharges from the City and SFPUC, sewage spills and combined sewage overflows render Islais Creek hazardous for human contact or non-contact recreation for significant periods every year. Further, Islais Creek Channel is impaired for ammonia, chlordane, dieldrin, hydrogen sulfide, PAHs (polycyclic aromatic hydrocarbons), and toxicity—impairments caused by raw sewage discharges.

92.     These waters are on the State of California's 2020-2022 Clean Water Act Section 303(d) list of impaired waterbodies. A waterbody that is listed as impaired cannot support the designated beneficial uses for that waterbody.

93.     The Basin Plan designates beneficial uses and water quality objectives for waters receiving discharges from the Bayside Facilities. The existing beneficial uses for both Mission Creek and Islais Creek include: commercial and recreational fishing, estuarine habitat, wildlife habitat, water contact recreation, noncontact water recreation, and navigation. The existing beneficial uses for Central and Lower San Francisco Bay include: industrial service supply, industrial process supply, commercial and sport fishing, shellfish harvesting, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, noncontact water recreation, and navigation. *See* Basin Plan, Ch. 2 at Table 2-1: Existing and Potential Beneficial Uses of Water Bodies in the San Francisco Bay Region.

94.     The Basin Plan provides narrative and numeric water quality objectives to define appropriate environmental quality and to control activities that can adversely affect aquatic systems. Water quality objectives are necessary to protect the present and potential beneficial uses. Numeric objectives describe pollutant concentration, physical/chemical conditions of the water itself, and the toxicity of the water to aquatic organisms, and are designed to represent the maximum amount of pollutants that can remain in the water column without causing any adverse effect on aquatic organisms, on people consuming those organisms or water, and on other current or potential beneficial uses. Table 3-1 of the Basin Plan provides numeric water quality objectives for bacteria, specifically fecal coliform, total coliform, E. coli, and enterococcus, including water contact recreation receiving water standards of 110 cfu/100 mL standard threshold value ("STV") for enterococcus concentrations and 320 cfu/100 mL STV for E. Coli concentrations. Water quality objectives for bacteria in Table 3-1 of the Basin Plan shall be strictly applied. *See* Basin Plan, Ch. 3.

95.     On the Oceanside, combined sewer system pipes and other conveyances discharge into the Pacific Ocean. The Pacific Ocean is a water of the United States. *See* Oceanside Permit, Attach. F, Fact Sheet, at F-4.

96.     San Francisco's western shoreline spans approximately six miles between Fort Funston to the south and Point Lobos to the north. Much of the coastline is public land that accommodates many recreational uses, including swimming, surfing, hiking, hang-gliding, and recreational shellfish harvesting. The coastal zone provides habitat for many sensitive plant and animal species, including Southern California steelhead, Central California Coho salmon, Central Valley spring-run chinook salmon, Sacramento River winter-run chinook salmon, humpback whales, leatherback turtles, green sea turtles, loggerhead turtles, olive ridley sea turtles, and white abalone. As with other waters impacted by discharges from the City and SFPUC, sewage spills and combined sewage overflows render the coastal zone hazardous for human contact or non-contact recreation for significant periods every year.

97.     The Basin Plan designates beneficial uses and water quality objectives for waters receiving discharges from the Oceanside Facilities. The existing beneficial uses for the Pacific Ocean include: industrial service supply, commercial and sport fishing, shellfish harvesting, marine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, noncontact water recreation, and navigation. *See* Basin Plan, Ch. 2 at Table 2-1: Existing and Potential Beneficial Uses of Water Bodies in the San Francisco Bay Region.

98.     The Ocean Plan also designates beneficial uses and water quality objectives for waters receiving discharges from the Oceanside Facilities. The existing beneficial uses for the Pacific Ocean include: industrial water supply, water contact and non-contact recreation, navigation, commercial and sport fishing, mariculture, rare and endangered species, marine habitat, fish migration, fish spawning, and shellfish harvesting. *See* Ocean Plan at 3.

///

## V.     FACTUAL BACKGROUND

### A.     The City's Combined Sewer Systems

99.     The City, through SFPUC, operates a combined sewer system that is rare in California—nearly every other city and municipality in the state has separate sewage and stormwater drainage infrastructure.



100.     On the Bayside, during dry weather and small rain events, wastewater flows from the Northshore, Central Basin, and Southeast Drainage Basins through large underground "Transport/Storage Boxes" and is then pumped to the Southeast Treatment Plant where it undergoes primary and secondary treatment to remove solids, bacteria, and other pollutants.

101.     On the Oceanside, during dry weather and small rain events, wastewater flows from western San Francisco and a small portion of Daly City and is then pumped to the Oceanside Water Pollution Control Plant ("Oceanside Plant") where it undergoes primary and secondary treatment to remove solids, bacteria, and other pollutants.

102.     However, when the capacity of the boxes, pipes, pumps, and treatment plants are exceeded by the volume of commingled stormwater and sewage flow entering them, the system is

designed to discharge from the Combined Sewer Discharge Points. These combined sewer overflows are regulated by the Bayside and Oceanside Permits pursuant to the federal CSO policy and the Clean Water Act.

103.     The below screenshot of a video recorded by SFPUC depicts a combined sewer overflow into Mission Creek on or about February 13, 2019.



104.     The Bayside system consists of the North Point Wet Weather Facility, the Southeast Treatment Plant, twenty-nine Combined Sewer Discharge Points ("CSDs"), and associated collection and storage structures. The Bayside system is separated into three hydrologically connected drainage basins, the Northshore, the Central Basin, and the Southeast. Each of these systems stores, transfers, and treats wastewater, and each has Combined Sewage Discharge Points which operate during significant wet weather events when the system reaches or exceeds capacity.



105.    The **Northshore system**, operating between the Golden Gate Bridge and just north of the Bay Bridge, discharges through the North Point Wet Weather Facility during wet weather, and is designed to allow for four (4) CSO events each year from discharge points 9 through 17. During dry weather, the Northshore system pumps sewage waste into the Central Basin Transport Storage Box where it eventually flows to the Southeast Treatment Plant. In the Northshore Drainage Basin, CSD Nos. 009 and 010 discharge to Marina Beach, CSD No. 011 discharges to Yacht Harbor #2, and CSD Nos. 013–017 discharge directly to Central San Francisco Bay. *See* Bayside Permit at Table 2. Discharge Point 10 was closed around 2021. According to SFPUC's modelling of its system, CSDs in the North Shore Drainage Basin discharge approximately 34.3 million gallons of minimally-treated combined sewer effluent during CSO events in a typical year. Primary contact recreation, including swimming and wading, occurs at Crissy Field East Beach near CSD No. 009.

106.    The **Southeast system**, operating south of Islais Creek, discharges through the Southeast Treatment Plant and is designed to allow for one (1) CSO event each year from discharge points 37 to 43. In the Southeast Drainage Basin, CSD Nos. 037 and 038 discharge to India Basin, CSD Nos. 040 and 042 discharge to the South Basin, and CSD No. 041 discharges to Yosemite Creek. *See* Bayside Permit at Table 2. This system drains the Sunnydale and Yosemite subbasins described above.

107.    The **Central Basin** system operates between the Ferry Building and Islais Creek. Storm and wastewater from the Central Basin drains primarily into the Transport Storage Box running along the Embarcadero and around Mission Creek, where it is pumped and piped to the Southeast Treatment Plant. The Central Basin is designed for ten (10) CSO events each year. These discharges occur into the Bay, Mission Creek, and Islais Creek from CSD Nos. 018 through 035. CSD No. 018 discharges directly to Central San Francisco Bay, CSD No. 019 discharges directly to Lower San Francisco Bay, CSD Nos. 022–028 discharge to Mission Creek, CSD Nos. 029, 030, and 030A discharge to the Central Basin, and CSD Nos. 031–035 discharge to Islais Creek. *See* Bayside Permit at Table 2. According to SFPUC's modelling, CSDs in the Central Drainage Basin discharge approximately 1.222 billion gallons of combined sewage and stormwater in a "typical" year. This portion of the system drains the Channel and Islais Creek sub-basins described above.



108.   The **Oceanside** Facilities collects predominantly combined sewage from western San Francisco and portions of Daly City, with some limited separate sanitary sewers serving isolated areas. *See* Oceanside Permit, Attach. F, Fact Sheet at F-4.

109.   During dry weather, combined sewage collected by the Oceanside Facilities flows west into transport storage boxes and tunnels to the Oceanside Water Pollution Control Plant, where it receives secondary treatment before discharging to the Pacific Ocean via Discharge Point No. 001. *See* Oceanside Permit at Attach. F, Fact Sheet F-5. During wet weather, the Oceanside Facilities are designed to allow for eight (8) CSO events each year from Discharge Point Nos. CSD-001 through CSD-007. *See id.* at Attach. F, Fact Sheet F-7.

110.   The combined sewer system comprises the Oceanside Plant, seven permitted CSO Outfalls, and the collection system including one major pump station, six minor pump stations, three large transport and storage structures, and approximately 250 miles of sewer pipes. Oceanside Permit, Attach. F, Fact Sheet at F-4 to F-5.



Figure B-4. Combined Sewer Discharge and Pump Station Locations

**B.**     **Impacts to the Receiving Waters from the City and SFPUC's Clean Water Act Violations**

111.     According to SFPUC's records, between November 2017 and April 2023, there were at least 40 Combined Sewer Discharges into Mission Creek, with a total volume of nearly 4.5 billion gallons of combined sewage and stormwater.

112.     SFPUC estimates that approximately six percent of its combined sewer overflows consist of sewage, as distinct from stormwater. And while the Clean Water Act and SFPUC's permit requires treatment of that sewage prior to discharge, SFPUC's Bayside Facilities do not in fact provide primary treatment of the combined sewer overflows.

113.     SFPUC further reported at least one (1) bypass event, four (4) leaks, and numerous other operational failures from the Bayside Facilities during this same time period. Combined wastewater and stormwater effluent contains human waste, viruses, protozoa, mold spores, bacteria, and chemicals that cause cancer or reproductive toxicity. High concentrations of these pollutants are typically found in raw and/or inadequately-treated effluent. Raw and minimally-treated sewage enters the Bayside Facilities and then subsequently flows directly to the Receiving Waters during CSO and bypass events.

/ / /

114.   The combined sewer flows also contain floatables, trash, and other harmful pollutants. The below photographs, taken after a combined sewer overflow in Mission Creek in December 2023, show fecal matter, syringes, and other trash present in Mission Creek.



*Photos: Baykeeper, Dec. 2023—Trash (above) and fecal matter (below) after CSO discharge.*

115.   SFPUC's combined sewer overflows cause spikes of bacteria in the Receiving Waters. The five charts below depict the results of SFPUC's bacteria water quality monitoring (vertical bars, log-scale) as compared to the Basin Plan's water quality standard (horizontal red line), and the dates and relative magnitude of combined sewer overflows for Mission Creek (size-dependent purple circles), by wet season from fall 2018 through spring 2023.

*Chart 1, November 2018 to March 2019:*



*Chart 2, November 2019 to March 2020:*



*Chart 3, October 2020 to March 2021:*



*Chart 4, October 2021 to March 2022:*



*Chart 5, November 2022 to March 2023:*



116.    In total, SFPUC discharged roughly 2.8 billion gallons of combined sewage and stormwater into Mission Creek between November 2018 and March 2023. During this time, SFPUC estimated on its website that approximately six percent of its combined sewage discharges consisted of sewage, with the remaining ninety-four percent being stormwater. Based on SFPUC's data and statements, it discharged over 169,000,000 gallons of *sewage* into Mission Creek during that time.

117.    These charts also demonstrate the strong causal relationship between the City's CSO events in Mission Creek and violations of bacteria water quality standards in Mission Creek.

**C.    The City and SFPUC's Violations of the Bayside Clean Water Act Permit**

>    *1.    Discharge Prohibition A*

118.    Discharge Prohibition A prohibits discharges of treated wastewater in any location or manner different from that described in the Bayside Permit. *See* Bayside Permit § III.A. SFPUC and the City violate this prohibition in a host of ways.

119.    First, SFPUC's self-reported violations on the State Board's California Integrated Water Quality System Project ("CIWQS") database indicate that discharges occurred as a result of equipment, operation and/or maintenance failures on numerous occasions in the past five years. *See* Exhibit 1 at Exhibit A, Table 1. The information in Table 1 demonstrates at least 146 violations and days of violations of the Bayside Permit's Discharge Prohibition A.

120.    Second, the CSO operations and associated discharge events violate Discharge Prohibition A, because they occur in a manner that is "different from" what the Bayside Permit

mandates. SFPUC's Bayside Permit incorporates its Maintenance and Operations Plan and its Long-Term Control Plan. *See* Bayside Permit § VI.C.5. Where SFPUC does not operate its system as described in those documents and the Bayside Permit, it is in violation of Discharge Prohibition A each time a CSO discharge occurs.

121.    Since March 6, 2019, SFPUC's CSO maintenance failures and discharge point closures mean that each CSO discharge in that time is inconsistent with Discharge Prohibition A. Three specific examples of these differences are: (1) the closure of the Pierce Street outfall; (2) the inoperability or closure of the Brannan Street Combined Sewer Discharge Point during that entire period, and (3) the inoperability or closure of the Fourth Steet South Combined Sewer Discharge Point during that entire period. In each instance, the Bayside Permit, as well as SFPUC's representations to the Regional Water Board and EPA about how its system operates were based on these outfalls being open and operable. Closing these discharge points resulted in changes to the quantity and pollutant content of discharges occurring during CSO events from other outfalls. As a result of these closed and/or inoperable discharge points, discharges occur from the system in substantially different ways than required or allowed by the Bayside Permit.

122.    The Bayside Permit allows deviation from these requirements only if the City and SFPUC demonstrate that changes to the operating parameters "will result" in improvements in storage or treatment of wastewater flows *and* the Executive Officer of the Regional Water Board concurs with that demonstration, in writing, prior to implementation of the changes by the City and SFPUC. Upon information and belief, SFPUC has not made the required demonstration that their closure or non-use of the Pierce Street, Brannon Street, and Fourth Street South outfalls "will result" in improvements, nor has SFPUC received written consent to deviate from the Bayside Permit's operational requirements. *See* Bayside Permit § VI.C.5.c.iii.

123.    The City and SFPUC's prohibited discharges from the Bayside Facilities to the Receiving Waters are ongoing and continuous. Each day and/or occasion that the City and SFPUC have discharged and continue to discharge treated wastewater in ways that violate Discharge Prohibition A is a separate and distinct violation of the Clean Water Act. The City and SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail to operate their system as required by

the Bayside Permit when it discharges sewage and wastewater from the Bayside Facilities to the

Receiving Waters in violation of the requirements of the Bayside Permit and the Clean Water Act. The

City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring after

March 6, 2019.

### 2.   *Discharge Prohibition C*

124.    Discharge Prohibition C prohibits bypass of untreated or partially-treated wastewater to

waters of the United States except during wet weather and as provided in the Bayside Permit. *See*

Bayside Permit § III.C. Available data indicates that at least one bypass of untreated or partially-treated

wastewater occurred since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 2.

125.    The City and SFPUC's prohibited discharges from the Bayside Facilities to the

Receiving Waters are ongoing and continuous. Each day and/or occasion that the City and SFPUC have

discharged and continue to discharge untreated or partially treated wastewater in violation of the

Bayside Permit's Discharge Prohibition C is a separate and distinct violation of the Clean Water Act.

The City and SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail

to prohibit the unpermitted bypass of untreated or partially treated wastewater from the Bayside

Facilities to the Receiving Waters in violation of the requirements of the Bayside Permit and the Clean

Water Act. The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act

occurring after March 6, 2019.

### 3.   *Discharge Prohibition D*

126.    Discharge Prohibition D prohibits any dry weather discharges from Discharge Point

Nos. 002 through 043. *See* Bayside Permit § III.D. Available data indicates that dry weather discharges

occurred from unauthorized discharge points on at least four occasions since March 6, 2019. *See*

Exhibit 1 at Exhibit A, Table 3. The information in Table 3 demonstrates at least four violations and

days of violation of Discharge Prohibition D.

127.    The City and SFPUC's prohibited discharges from the Bayside Facilities to the

Receiving Waters are ongoing and continuous. Each day and/or occasion that the City and SFPUC have

discharged and continue to discharge sewage during dry weather in violation of the Bayside Permit's

Discharge Prohibition D is a separate and distinct violation of the Clean Water Act. The City and

SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail to prohibit the unpermitted discharge of sewage from the Bayside Facilities to the Receiving Waters during dry weather in violation of the requirements of the Bayside Permit and the Clean Water Act. The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring after March 6, 2019.

*4.   Discharge Prohibition F*

128.   Discharge Prohibition F prohibits CSOs of untreated or partially-treated wastewater to waters of the United States except as expressly authorized in the Bayside Permit. *See* Bayside Permit § III.F. Again, the City and SFPUC have and continue to violate this prohibition in several ways.

129.   First, SFPUC's self-reporting demonstrates that the Bayside Facilities discharged untreated or partially-treated wastewater on at least 14 occasions since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 4. The information in Table 4 demonstrates at least 14 violations and 16 days of violation of Discharge Prohibition F.

130.   Second, the City and SFPUC's wastewater discharges during CSO events are discharges of untreated wastewater in violation of Discharge Prohibition F. As described below, the City and SFPUC fail to comply with the combined sewer overflow controls that arise from the Bayside Permit, the federal CSO Policy, the Nine Minimum Controls, the Long-Term Control Plan, and the Operations and Maintenance Plan. As a result of these failures, the CSO discharges by the City and SFPUC into the Receiving Waters consist of untreated wastewater. While SFPUC and the City presume that all of the wastewater discharged during CSO events receives at least primary treatment, this presumption is belied by the reality of the harmful contents of those discharges, including trash, floatable materials, human fecal matter, and other waste inconsistent with primary treatment.

131.   Third, the City and SFPUC's wastewater discharges during CSO events are discharges of partially treated wastewater that are not "expressly authorized by the [Bayside] Permit." Bayside Permit § III.F. To the extent some of the CSO discharges do in fact receive primary or equivalent to primary treatment, such discharges still violate Discharge Prohibition F, because those discharges of partially treated wastewater are not expressly authorized by the Bayside Permit because they occur in

ways that are different from and inconsistent with the Bayside Permit's requirements. *See* Bayside Permit § VI.C.

132.    The City and SFPUC's prohibited combined sewer discharges from the Bayside Facilities to the Receiving Waters are ongoing and continuous. Each day and/or occasion that the City and SFPUC have discharged and continue to result in combined sewer discharges of untreated or partially treated wastewater in violation of the Bayside Permit's Discharge Prohibition F is a separate and distinct violation of the Clean Water Act. The City and SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail to prohibit the unpermitted discharge of untreated or partially treated wastewater, including raw sewage, from the Bayside Facilities to the Receiving Waters in violation of the requirements of the Bayside Permit and the Clean Water Act. The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring after March 6, 2019.

### 5.    *Receiving Water Limitation A*

133.    Receiving Water Limitation A prohibits any discharge that causes floating, suspended or deposited macroscopic particulate matter or foams, alteration of temperature, turbidity, or color, and "toxic or other deleterious substances," to exist in receiving waters outside the "near-field mixing zone." Bayside Permit § V.A.

134.    Videos taken by SFPUC and photos taken by Baykeeper during and shortly after storm and combined discharge events reveal myriad floating objects, including feces, trash, condoms, and syringes, discharging to Mission Creek from Bayside overflow structures on at least the following dates: December 27, 2022; December 31, 2022; January 9, 2023; January 14, 2023; February 24, 2023; March 9, 2023; March 14, 2023; March 21, 2023; March 28, 2023; December 18, 2023, and December 19, 2023. *See* Exhibit 1 at Exhibit D.

135.    Due to the velocity of flow during combined sewer overflow and discharge events into Mission Creek, each time SFPUC conducts a combined sewer discharge it contains harmful levels of trash, floating objects, and other deleterious materials.

136.    Further, the discharges from the Bayside Facilities to Mission Creek violate Receiving Water Limitation A every time these facilities overflow during rain events or bypass normal treatment processes during dry weather. CSOs from the Mission Creek CSD outfalls have occurred on at least the

following dates during the relevant time period: March 6, 2019; March 20, 2019; November 26, 2019; December 7, 2019; January 16, 2020; January 27, 2021; January 29, 2021; October 21, 2021; October 22, 2021; October 23–24, 2021; November 8–9, 2021; December 13, 2021; December 16, 2021; December 23, 2021; December 27, 2022; December 31, 2022; January 4, 2023; January 9, 2023; January 10, 2023; January 11, 2023; January 14, 2023; January 15, 2023; January 16, 2023; February 23–24, 2023; March 9, 2023; March 10, 2023; March 14, 2023; March 21–22, 2023; March 28, 2023; November 18, 2023; December 18, 2023; December 19, 2023; December 20, 2023; December 29, 2023; January 13, 2024; January 14, 2024; January 22, 2024, and January 31, 2024. This information demonstrates at least 42 violations and days of violation of Receiving Water Limitation A.

137.    In addition, millions of gallons of untreated combined wastewater discharged into the San Francisco Bay due to extensive flooding in the Marina Boulevard area on October 24, 2021 and December 31, 2022. *See* Exhibit 1 at Exhibit A, Table 4. This information demonstrates at least an additional two (2) violations of Receiving Water Limitation A. These violations are ongoing and will continue each time contaminated water is discharged in violation of Receiving Water Limitation A of the Bayside Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

138.    Each time discharges from the Bayside Facilities cause floating, suspended or deposited macroscopic particulate matter or foams, alteration of temperature, turbidity, or color, and "toxic or other deleterious substances," to exist in Receiving Waters outside the "near-field mixing zone" is a separate and distinct violation of Receiving Water Limitation A of the Bayside Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring after March 6, 2019.

### 6.    *Receiving Water Limitation C*

139.    Receiving Water Limitation C prohibits any discharge that causes "a violation of any water quality standard for receiving waters outside near-field mixing zones." Bayside Permit § V.C.

140.    SFPUC's self-monitoring data demonstrates that discharges from the Bayside Facilities contain elevated concentrations of pollutants, such as E. Coli and enterococcus, at levels exceeding applicable water quality standards by orders of magnitude. *See*, *e.g.*, Exhibit 1 at Exhibit B (listing results of SFPUC's water quality monitoring and instances when violations of water quality standards

occurred); *see also* Exhibit 1 at Exhibit C (Basin Plan, Table 3-1). Discharges with elevated levels of bacteria and other pollutants adversely affect the beneficial uses of the Receiving Waters, and thus violate Receiving Water Limitation C of the Bayside Permit and the Clean Water Act.

141.    SFPUC's self-reporting demonstrates that CSO events caused standard threshold values (STV) for concentrations of enterococcus and/or E. Coli exceeding applicable water quality standards at one or more Bayside CSO monitoring locations during at least 17 months since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 5. The information in Table 5 demonstrates at least 114 violations and 495 days of violation of Receiving Water Limitation C. SFPUC's sampling indicates that the discharges from the Bayside Facilities violate Receiving Water Limitation C every time these facilities overflow during rain events or bypass normal treatment processes during dry weather.

142.    These violations are ongoing and will continue each time contaminated water is discharged in violation of Receiving Water Limitation C of the Bayside Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges from the Bayside Facilities cause a violation of an applicable water quality standard is a separate and distinct violation of Receiving Water Limitation C of the Bayside Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring after March 6, 2019.

### 7.    *Nine Minimum Controls*

143.    The Bayside Permit's "Nine Minimum Controls" term requires proper operation and maintenance of the collection system and the combined sewer discharge outfalls "to reduce the magnitude, frequency, and duration of combined sewer discharges," Bayside Permit § VI.C.5.b.i.(b), requires operation of the Southeast Plant and North Point Facility at maximum treatable flow during wet weather, *see* Bayside Permit § VI.C.5.b.iv, and prohibits dry weather CSOs from CSD Nos. 002 through 043, *see* Bayside Permit § VI.C.5.b.v.

144.    SFPUC's self-reporting indicate at least 171 occasions combined sewer system operation and/or maintenance failures since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 6. The operation and maintenance failures listed in Table 6 further violated the requirement to operate the Southeast Plant and North Point Facility at maximum treatable flow during wet weather on at least the

following dates: October 21, 2021; October 24, 2021; December 31, 2022; March 21–22, 2023, and March 28, 2023.

145.    The City and SFPUC also fail to ensure that floatables and settlable solids are not discharged in violation of the Nine Minimum Controls. SFPUC's Combined sewer overflows contain large amounts of visible trash and other floatables which the Nine Minimum Controls bar SFPUC from discharging in its combined sewer overflows.

146.    SFPUC's existing safeguards against floatables are ineffective and do not meet the requirements of the Nine Minimum Controls or its Clean Water Act permits.

147.    These operation and maintenance failures further violated the prohibition against dry weather CSOs from Discharge Point No. 002 on at least the following dates: August 5, 2021; March 17, 2023, and June 25, 2023. The information in Table 6 demonstrates at least 180 violations and 171 days of violation of the Bayside Permit's "Nine Minimum Controls" term.

148.    The City and SFPUC's failure to meet the Bayside Permit's "Nine Minimum Controls" term is ongoing and continuous. The City and SFPUC have therefore been in daily and continuous violation of the Bayside Permit every day since at least March 6, 2019. Each day and/or occasion that the City and SFPUC fail to properly operate and maintain its sewer system, prevent dry weather CSOs, and control solid and floatable materials in CSOs is a separate and distinct violation of the Clean Water Act. The City and SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail to meet the requirements of the Bayside Permit and the Clean Water Act. The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring after March 6, 2019.

### 8.    *Long-Term Control Plan*

149.    The Bayside Permit's "Long Term Control Plan" term requires capture of "100 percent of the combined sewage flow collected in the combined sewage system during precipitation events" for equivalent-to-primary, primary, or secondary treatment. Bayside Permit § VI.C.5.c.ii. "Primary Clarification," as described in the CSO Control Policy, requires removal of "floatables and settleable solids." 59 Fed. Reg. 18693. The term also details the operating parameters for each wet weather facility, including flow and storage capacities required to be met prior to CSD events, *see* Bayside Permit § VI.C.5.c.iii, and requires revision of operating protocols "as necessary to ensure compliance

with the Nine Minimum Controls and the Long-Term Control Plan requirements of the Combined Sewer Overflow Control Policy," *id.* at § VI.C.5.a.

150.    Videos taken by SFPUC and photos taken by Baykeeper during storm events reveal myriad floating objects, including feces, trash, condoms, and syringes, discharging to Mission Creek from Bayside overflow structures, as well as the two self-reported occasions of extensive flooding in the Marina Boulevard area, demonstrate failure to capture and treat the required 100 percent of combined sewage flow collected in the combined sewage system during precipitation events. Discharges from the Bayside Facilities to Mission Creek violate the Bayside Permit's "Long Term Control Plan" term every time these facilities overflow during rain events or bypass normal treatment processes during dry weather. CSOs from the Mission Creek CSD outfalls have occurred on at least the following dates during the relevant time period: March 6, 2019; March 20, 2019; November 26, 2019; December 7, 2019; January 16, 2020; January 27, 2021; January 29, 2021; October 21, 2021; October 22, 2021; October 23–24, 2021; November 8–9, 2021; December 13, 2021; December 16, 2021; December 23, 2021; December 27, 2022; December 31, 2022; January 4, 2023; January 9, 2023; January 10, 2023; January 11, 2023; January 14, 2023; January 15, 2023; January 16, 2023; February 23–24, 2023; March 9, 2023; March 10, 2023; March 14, 2023; March 21–22, 2023; November 18, 2023; December 18, 2023; December 19, 2023; December 20, 2023; December 29, 2023; January 13, 2024; January 14, 2024; January 22, 2024, and January 31, 2024. In addition, millions of gallons of untreated combined wastewater discharged to the San Francisco Bay due to flooding on October 24, 2021 and December 31, 2022. This information demonstrates at least 39 violations and days of violation of the Bayside Permit's "Long Term Control Plan" section VI.C.5.c.ii since March 6, 2019.

151.    SFPUC's self-reporting indicate wet weather facility operating parameter violations on at least 11 occasions since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 7. The information in Table 7 demonstrates at least 11 violations and days of violation of the Bayside Permit's "Long Term Control Plan" section VI.C.5.c.iii since March 6, 2019.

152.    Moreover, SFPUC's self-reported monitoring data demonstrate that the Bayside Facilities do not achieve relevant water quality objectives and therefore do not overcome the "presumption" described in the Long Term Control Plan and the CSO Policy. Specifically, CSO events

1  caused standard threshold values (STV) for concentrations of enterococcus and/or E. Coli exceeding

2  applicable water quality standards at one or more Bayside CSO monitoring locations during at least 17

3  months since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 5. Water quality monitoring showed no

4  exceedances during only one month (May 2019) when a CSO event occurred in the past five years.

5  153.   Regulators have confirmed SFPUC's failure to meet water quality standards as required.

6  For example, the Bayside Permit Fact Sheet recounts that CSD monitoring conducted under the

7  previous permit, Order No. R2-2008-0007, showed average combined sewer discharge pollutant

8  concentrations "below acute water quality objectives for metals and other priority pollutants, *with the*

9  *exceptions of copper and zinc*." Bayside Permit, Fact Sheet at F-42 (emphasis added). In a November

10  21, 2019 letter to SFPUC regarding the reissuance of the Oceanside Permit, the EPA stated its concern

11  that the approach adopted by San Francisco in the 1970s, with its continued reliance on primary

12  treatment, does not meet the "presumption" approach under the CSO Policy. Further, SFPUC has self-

13  reported more than the four (4) CSOs failing to meet minimum treatment requirements per year, and

14  SFPUC's failure to treat 85% of CSO volume, or to remove 85% of the mass of impairing pollutants in

15  CSOs, for at least the last five years. The City and SFPUC have undertaken no Long Term Control Plan

16  revisions to bring operating protocols into compliance with the Clean Water Act and therefore operate

17  in violation of the Bayside Permit.

18  154.   Additionally, as described above, SFPUC fails to operate the system as dictated and

19  required by the Bayside Permit, because it has chosen to cease using discharge points without

20  demonstrating that those closures will result in beneficial impacts related to storage or treatment, and

21  with the written consent of the Regional Water Board. Instead, SFPUC has and continues to operate its

22  combined sewer discharges in ways not authorized by the Bayside Permit and which are inconsistent

23  with its Long-Term Control Plan and Operations and Maintenance Plan.

24  155.   Each time discharges from the Bayside Facilities cause a violation of an applicable

25  water quality standard is a separate and distinct violation of the Bayside Permit and Section 301(a) of

26  the Clean Water Act, 33 U.S.C. § 1311(a). The City and SFPUC are subject to civil penalties for all

27  violations of the Clean Water Act occurring after March 6, 2019.

28

### 9.   *Monitoring and Reporting Requirements*

156.   The Bayside Permit requires the City to regularly perform monitoring of its compliance with the permits, including inspection of its pipes, pump stations, outfalls, and other components of its systems, and monitoring its discharges and their impacts on receiving waters.

157.   The Bayside Permit requires the City to develop and maintain a database containing specific information about each Excursion that occurs within the service area of the Southeast Plant, including, but not limited to, the location (including cross streets), the estimated volume in gallons, the date and time the Excursion was reported to SFPUC, the operator arrival date and time, the source of the Excursion, the cause of the Excursion, and corrective actions taken. *See* Bayside Permit § VI.C.4.c.ii(a).

158.   The City has repeatedly failed to record either all required information or any required information regarding each Bayside Facilities' excursion in its excursion database.

159.   The Bayside Permit further requires the City to report any Excursion of more than 1,000 gallons to the Regional Water Board and the San Francisco Department of Public Health not later than two hours after becoming aware of the discharge. *See* Bayside Permit § VI.C.4.c.ii(b).

160.   The City has repeatedly failed to report Bayside excursions with a volume greater than 1,000 gallons to the Regional Water Board.

161.   Each of the City's failures to fully report or record information in compliance with the requirements of the applicable NPDES Permit is a separate violation of the applicable NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The City and SFPUC are subject to injunctive relief and civil penalties for all violations of the Clean Water Act occurring in the last five years.

### 10.   *Public Notification Requirements*

162.   The Bayside Permit requires the City to inform and notify the public of when and where CSOs or Excursions occur, particularly when the public could come into contact with combined sewage. *See* Bayside Permit § VI.C.5.b.viii. The City is also required to post warning signs at beach locations where water contact recreation occurs whenever a CSO occurs that could affect recreational

users at those locations. Warning signs must be posted on the same day as the CSO if it occurs before 4:00 pm, otherwise the City is required to post the sign by 8:00 am the next day. *See id.* § VI.C.5.b.viii.

163.    The City has failed to notify the public of the location and time of actual CSO occurrences from the Bayside system by failing to timely post warning signs on public beaches where water contact recreation occurs.

**D.    The City and SFPUC's Violations of its Oceanside Clean Water Act Permit**

**1.    *Discharge Prohibition B***

164.    Discharge Prohibition B prohibits bypass of untreated or partially-treated wastewater to waters of the United States except during wet weather and as provided in the Oceanside Permit. *See* Oceanside Permit § III.C. Available data indicates that at least twelve (12) bypasses of untreated or partially-treated wastewater occurred in the last five years. *See* Exhibit 2, Table 1. The information in Table 1 demonstrates at least twelve (12) violations and days of violation of Discharge Prohibition B.

165.    The City and SFPUC's prohibited discharges from the Oceanside Facilities to the Receiving Waters are ongoing and continuous. Each day and/or occasion that the City and SFPUC have discharged and continue to discharge untreated or partially treated wastewater in violation of the Oceanside Permit's Discharge Prohibition B is a separate and distinct violation of the Clean Water Act. The City and SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail to prohibit the unpermitted bypass of untreated or partially treated wastewater from the Bayside Facilities to the Receiving Waters in violation of the requirements of the Bayside Permit and the Clean Water Act. The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring in the last five years.

**2.    *Discharge Prohibition D***

166.    Discharge Prohibition D prohibits any dry weather discharges from Discharge Point Nos. 002 through 007. *See* Oceanside Permit § III.D. Available data indicates that dry weather discharges occurred from unauthorized discharge points on at least one (1) occasion in the past five years. *See* Exhibit 2, Table 2. The information in Table 2 demonstrates at least one (1) violation and day of violation of Discharge Prohibition D.

167.     The City and SFPUC's prohibited discharges from the Oceanside Facilities to the receiving waters are ongoing and continuous. Each day and/or occasion that the City and SFPUC have discharged and continue to discharge sewage during dry weather in violation of the Oceanside Permit's Discharge Prohibition D is a separate and distinct violation of the Clean Water Act. The City and SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail to prohibit the unpermitted discharge of sewage from the Oceanside Facilities to the receiving waters during dry weather in violation of the requirements of the Oceanside Permit and the Clean Water Act. The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring in the last five years.

### 3.     *Nine Minimum Controls*

168.     The Oceanside Permit's "Nine Minimum Controls" term requires SFPUC to "maximize the volume of wastewater that receives treatment at the Oceanside Water Pollution Control Plant (i.e., secondary treatment for 43 MGD and primary treatment for an additional 22 MGD) and is discharged at Discharge Point No. 001." Oceanside Permit § VI.C.5.a.iv. The term further prohibits dry weather CSOs. *See id.* § VI.C.5.a.v.

169.     SFPUC's self-reporting indicate at least four (4) occasions when SFPUC failed to maximize the volume of wastewater that receives treatment at the Oceanside Water Pollution Plant in the last five years. *See* Exhibit 2, Table 3. The information in Table 3 demonstrates at least four (4) violations and four (4) days of violation of the Oceanside Permit's "Nine Minimum Controls" term.

170.     SFPUC's self-reporting indicate at least one (1) occasion when SFPUC failed to prohibit dry weather CSOs. *See* Exhibit 2, Table 3. The information in Table 3 demonstrates at least one (1) additional violation and one (1) additional day of violation of the Oceanside Permit's "Nine Minimum Controls" term.

171.     The City and SFPUC also fail to ensure that floatables and settlable solids are not discharged in violation of the Nine Minimum Controls. SFPUC's CSOs contain large amounts of visible trash and other floatables which the Nine Minimum Controls bar SFPUC from discharging in its combined sewer overflows.

172.   SFPUC's existing safeguards against floatables are ineffective and do not meet the requirements of the Nine Minimum Controls or its Clean Water Act permits.

173.   The City and SFPUC's failure to meet the Oceanside Permit's "Nine Minimum Controls" term is ongoing and continuous. The City and SFPUC have therefore been in daily and continuous violation of the Oceanside Permit every day for the last five years. The City and SFPUC's violations will continue each day and/or occasion that the City and SFPUC fail to meet the requirements of the Oceanside Permit and the Clean Water Act. The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring in the last five years.

### 4.   *Long-Term Control Plan*

174.   The Oceanside Permit's "Long Term Control Plan" term requires capture of "100 percent of the combined wastewater and stormwater flow collected in the combined sewer system during precipitation events" for equivalent-to-primary, primary, or secondary treatment. Oceanside Permit § VI.C.5.c.iii. The term also details the operating parameters for each wet weather facility, including flow and storage capacities required to be met prior to CSD events. *See id.* § VI.C.5.c.iv.

175.   SFPUC's self-reporting indicates SFPUC failed to capture 100 percent of the combined wastewater and stormwater flow collected in the combined sewer system during precipitation events for equivalent-to-primary, primary, or secondary treatment on at least one (1) occasion in the last five years. *See* Exhibit 2, Table 4. This information demonstrates at least one (1) violation and day of violation of the Oceanside Permit's "Long Term Control Plan" section VI.C.5.c.iii in the last five years.

176.   SFPUC's self-reporting indicates wet weather facility operating parameter violations on at least seven (7) occasions in the last five years. *See* Exhibit 2, Table 4. The information in Table 4 demonstrates at least seven (7) additional violations and days of violation of the Oceanside Permit's "Long Term Control Plan" section VI.C.5.c.iv in the last five years.

177.   Each time discharges from the Oceanside Facilities cause a violation of the Long Term Control Plan is a separate and distinct violation of the Oceanside Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The City and SFPUC are subject to civil penalties for all violations of the Clean Water Act occurring in the last five years. The Oceanside Permit's "Long Term Control Plan" term requires capture of "100 percent of the combined wastewater and stormwater flow

collected in the combined sewer system during precipitation events" for equivalent-to-primary, primary, or secondary treatment. Oceanside Permit § VI.C.5.c.iii. The term also details the operating parameters for each wet weather facility, including flow and storage capacities required to be met prior to CSD events. *See* Oceanside Permit § VI.C.5.c.iv.

### 5. *Monitoring and Reporting Requirements*

178. The Oceanside Permit requires the City to regularly perform monitoring of its compliance with the permits, including inspection of its pipes, pump stations, outfalls, and other components of its systems, and monitoring its discharges and their impacts on receiving waters.

179. The Oceanside Permit requires the City to enter information on all Oceanside Excursions (referred to in the Permit as Sewer Overflows from the Combined Sewer System) into the California Integrated Water Quality System ("CIWQS") online database, including all required database fields. *See* Oceanside Permit § VI.C.5.a.ii.(b)(1). Required database fields include location and volume estimate for the Excursion. *Id.*

180. The City has repeatedly failed to enter information for each Oceanside Excursion into the CIWQS Online Database.

181. Each of the City's failures to fully report or record information in compliance with the requirements of the applicable NPDES Permit is a separate violation of the applicable NPDES Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The City and SFPUC are subject to injunctive relief and civil penalties for all violations of the Clean Water Act occurring in the last five years.

### 6. *Public Notification Requirements*

182. The Oceanside Permit requires the City to inform the public of when and where CSOs occur and to post warning signs at beach locations where water contact recreation occurs whenever a CSO occurs that could affect recreational users at those locations. *See* Oceanside Permit § VI.C.5.a.viii. Warning signs must include "No Swimming" signs and "inform users that bacteria concentrations may be elevated." *See id.* § VI.C.5.a.viii(b). Warning signs must be posted on the same day as the CSO if it occurs before 4:00 pm, otherwise the City is required to post the sign by 8:00 am the next day. *See id.* § VI.C.5.a.viii.

183.     The City has repeatedly failed to notify the public of the location and time of actual CSO occurrences from the Oceanside system by failing to timely post warning signs on public beaches where water contact recreation occurs. For example, the City failed to post signs on Ocean Beach at times of CSO discharges that could affect recreational users during the 2022-23 wet weather season and the current wet weather season.

184.     When the City did post signs, those signs failed to inform recreators that the no swimming warnings were due to discharges of combined sewage or concerns regarding elevated bacteria concentrations. The signs did not inform the public of required information related to CSOs or adequately inform the public of the health risks posed by possible pathogens on the beach as required by the Oceanside Permit.

185.     The Oceanside Permit also requires the City to affix permanent signs to CSO outfalls that are visible and legible from a distance of 50 feet onshore and offshore. *See* Oceanside Permit § VI.C.5.a.viii(a).

186.     The City has repeatedly failed to affix permanent signs to all Oceanside CSO outfalls, failing to ensure that permanent signs on Oceanside CSO outfalls are visible and legible from 50 feet onshore and offshore, including at the three CSO outfalls located on or near Ocean Beach. The signs are small and, in some cases, are affixed to the outfall in such a way that persons cannot read the text. There are also no signs on the sides of the outfalls to alert beachgoers that the discharge contains sewage.

187.     Each day that the City has failed to post a notice, or an adequate notice, of a CSO event that could affect a beach location where water contact recreation occurs is a violation of the Oceanside Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The City and SFPUC are subject to injunctive relief and civil penalties for all violations of the Clean Water Act occurring in the last five years.

/ / /

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Prohibited Discharges, Bayside Permit and Clean Water Act

### (33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))

188.    Baykeeper incorporates the allegations contained in paragraphs 1 to 187 as though fully set forth herein.

189.    The Bayside Permit includes Discharge Prohibition A which prohibits any discharge of untreated or partially-treated wastewater to waters of the United States except as expressly authorized in the Bayside Permit.

190.    The City and SFPUC have discharged and continue to discharge untreated or partially-treated wastewater to San Francisco Bay, Mission Creek Channel and Islais Creek Channel in violation of the Bayside Permit.

191.    SFPUC's self-reporting on CIWQS indicate discharges occurred as a result of equipment and/or maintenance failures. *See* Exhibit 1 at Exhibit A, Table 1. The information in Table 1 demonstrates at least 146 violations and days of violations of the Bayside Permit's Discharge Prohibition A.

192.    The City and SFPUC's CSO operations and associated discharge events occur in a manner that "different from" the Bayside Permit's mandates, in violation of Discharge Prohibition A. Since the Bayside Permit incorporates SFPUC's Maintenance and Operations Plan and Long Term Control Plan, operational deviations from these plans are violations of the Discharge Prohibition A each time a CSO discharge occurs.

193.    Since March 6, 2019, SFPUC's CSO maintenance failures and discharge point closures result in each CSO discharge during that time period is inconsistent with Discharge Prohibition A, including: (1) the closure of the Pierce Street outfall; (2) the inoperability or closure of the Brannan Street Combined Sewer Discharge Point during that entire period, and (3) the inoperability or closure of the Fourth Steet South Combined Sewer Discharge Point during that entire period.

194.    The City and SFPUC did not demonstrate operational changes "will result" in improvements in storage or treatment of wastewater flows, nor did they receive concurrence from the Regional Water Board approving operational changes, in violation of Discharge Prohibition A.

195.    Each CSO discharge, since at least March 6, 2019, that the City and SFPUC have discharged in violation of Discharge Prohibition A is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

196.    The Bayside Permit includes Discharge Prohibition C which prohibits bypass of untreated or partially-treated wastewater to waters of the United States except during wet weather and as provided in the Bayside Permit.

197.    Available data indicates that at least one bypass of untreated or partially-treated wastewater occurred since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 2.

198.    The Bayside Permit includes Discharge Prohibition D which prohibits any dry weather discharges from Discharge Point Nos. 002 through 043.

199.    Available data indicates that dry weather discharges occurred from unauthorized discharge points on at least four occasions since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 3. The information in Table 3 demonstrates at least four violations and days of violation of Discharge Prohibition D.

200.    Discharge Prohibition F prohibits CSOs of untreated or partially-treated wastewater to waters of the United States except as expressly authorized in the Bayside Permit. *See* Bayside Permit § III.F.

201.    SFPUC's self-reporting demonstrates that the Bayside Facilities discharged untreated or partially-treated wastewater on at least 14 occasions since March 6, 2019. *See* Exhibit 1 at Exhibit A, Table 4. The information in Table 4 demonstrates at least 14 violations and 16 days of violation of Discharge Prohibition F.

202.    SFPUC's wastewater discharges during CSO events are also discharges of untreated and/or partially-treated wastewater violate Discharge Prohibition F. SFPUC fails to comply with the combined sewer overflow controls that arise from the Bayside Permit, the federal CSO Policy, the Nine Minimum Controls, the Long-Term Control Plan, and the Operations and Maintenance Plan.

203.    As a result of these failures, the CSO discharges by the City and SFPUC into the Receiving Waters consist of partially treated and/or untreated wastewater. Those discharges, including trash, floatable materials, human fecal matter, and other waste, do not receive primary treatment or equivalent to primary treatment.

204.    SFPUC's wastewater discharges during CSO events are discharges of untreated or partially-treated wastewater that are not "expressly authorized by the [Bayside] Permit."

205.    Each of these violations is ongoing and continuous.

206.    The City and SFPUC's Clean Water Act violations described in the paragraphs above will continue in the future until the City and SFPUC operate the Bayside Facilities in accordance with the Bayside Permit.

207.    By committing the acts and omissions alleged above after March 6, 2019, the City is subject to an assessment of civil monetary penalties for each and every violation of the Clean Water Act in the amount of up to $66,712 per day.

208.    An action for injunctive relief is authorized by Clean Water Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Baykeeper and Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

209.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against the City and SFPUC as set forth below.

## SECOND CAUSE OF ACTION

### Violations of Receiving Water Limitations, Bayside Permit and Clean Water Act
### (33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))

210.    Baykeeper incorporates the allegations contained in paragraphs 1 to 187 as though fully set forth herein.

211.    Receiving Water Limitation A prohibits any discharge that causes floating, suspended or deposited macroscopic particulate matter or foams, alteration of temperature, turbidity, or color, and

"toxic or other deleterious substances," to exist in receiving waters outside the "near-field mixing zone." Bayside Permit § V.A.

212.    Videos taken by SFPUC and photos taken by Baykeeper during and shortly after storm and combined discharge events reveal myriad floating objects, including feces, trash, condoms, and syringes, discharging to Mission Creek from Bayside overflow structures. *See* Exhibit 1 at Exhibit D.

213.    Due to the velocity of flow during combined sewer overflow and discharge events into Mission Creek, each time SFPUC conducts a combined sewer discharge it contains harmful levels of trash, floating objects, and other deleterious materials.

214.    The discharges from the Bayside Facilities to Mission Creek violate Receiving Water Limitation A every time these facilities overflow during rain events or bypass normal treatment processes during dry weather.

215.    In addition, millions of gallons of untreated combined wastewater discharged to the San Francisco Bay due to extensive flooding in the Marina Boulevard area on or about October 24, 2021 and December 31, 2022. *See* Exhibit 1 at Exhibit A, Table 4.

216.    Each time discharges from the Bayside Facilities cause floating, suspended or deposited macroscopic particulate matter or foams, alteration of temperature, turbidity, or color, and "toxic or other deleterious substances," to exist in Receiving Waters outside the "near-field mixing zone" is a separate and distinct violation of Receiving Water Limitation A of the Bayside Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

217.    Receiving Water Limitation C prohibits any discharge that causes "a violation of any water quality standard for receiving waters outside near-field mixing zones." Bayside Permit § V.C.

218.    SFPUC's self-monitoring data demonstrates that discharges from the Bayside Facilities contain elevated concentrations of pollutants, such as E. Coli and enterococcus, at levels exceeding applicable water quality standards by orders of magnitude. *See*, *e.g.*, Exhibit 1 at Exhibit B (listing results of SFPUC's water quality monitoring and instances when violations of water quality standards occurred); *see also* Exhibit 1 at Exhibit C (Basin Plan, Table 3-1).

219.    Discharges with elevated levels of bacteria and other pollutants adversely affect the beneficial uses of the Receiving Waters, and thus violate Receiving Water Limitation C of the Bayside Permit and the Clean Water Act.

220.    SFPUC's self-reporting demonstrates that CSO events caused standard threshold values (STV) for concentrations of enterococcus and/or E. Coli exceeding applicable water quality standards at one or more Bayside CSO monitoring locations during at least 17 months since March 2019. *See* Exhibit 1 at Exhibit A, Table 5. SFPUC's sampling indicates that the discharges from the Bayside Facilities violate Receiving Water Limitation C every time these facilities overflow during rain events or bypass normal treatment processes during dry weather.

221.    Each of these violations is ongoing and continuous.

222.    The City and SFPUC's Clean Water Act violations described in the paragraphs above will continue in the future until the City and SFPUC operate the Bayside Facilities in accordance with the Bayside Permit.

223.    By committing the acts and omissions alleged above after March 6, 2019, the City is subject to an assessment of civil monetary penalties for each and every violation of the Clean Water Act in the amount of up to $66,712 per day.

224.    An action for injunctive relief is authorized by Clean Water Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Baykeeper and Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

225.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against the City and SFPUC as set forth below.

### THIRD CAUSE OF ACTION

### Prohibited Discharges, Oceanside Permit and Clean Water Act

### (33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))

226.    Baykeeper incorporates the allegations contained in paragraphs 1 to 187 as though fully set forth herein.

227.     Discharge Prohibition B prohibits bypass of untreated or partially-treated wastewater to waters of the United States except during wet weather and as provided in the Oceanside Permit. *See* Oceanside Permit § III.C.

228.     Available data indicates that at least twelve bypass of untreated or partially-treated wastewater occurred during the last five years. *See* Exhibit 2, Table 1.

229.     Discharge Prohibition D prohibits any dry weather discharges from Discharge Point Nos. 002 through 007. *See* Oceanside Permit § III.D.

230.     Available data indicates that dry weather discharges occurred from unauthorized discharge points on at least one occasion in the last five years. *See* Exhibit 2, Table 2.

231.     Each of these violations is ongoing and continuous.

232.     The City and SFPUC's Clean Water Act violations described in the paragraphs above will continue in the future until the City and SFPUC operate the Oceanside Facilities in accordance with the Oceanside Permit.

233.     By committing the acts and omissions alleged above after March 6, 2019, the City is subject to an assessment of civil monetary penalties for each and every violation of the Clean Water Act in the amount of up to $66,712 per day.

234.     An action for injunctive relief is authorized by Clean Water Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Baykeeper and Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

235.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against the City and SFPUC as set forth below.

/ / /

**FOURTH CAUSE OF ACTION**

**Unpermitted Combined Sewer Overflow Discharges,**

**Bayside and Oceanside Permits and Clean Water Act**

**(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

236.   Baykeeper incorporates the allegations contained in paragraphs 1 to 187 as though fully set forth herein.

237.   The Bayside Permit incorporates various Combined Sewer System Controls. *See* Bayside Permit § VI.C.5. This requires SFPUC to operate the Bayside system to maximize treated flow during wet weather and prohibits dry weather CSOs.

238.   The Bayside Permit requires compliance with the Nine Minimum Controls. *See* Bayside Permit § VI.C.5.b.

239.   The Bayside Permit requires an appropriate Long-Term Control Plan and compliance with the requirements of that Long-Term Control Plan. *See* Bayside Permit § VI.C.5.c.

240.   The Bayside Permit requires SFPUC to have and follow an Operations and Maintenance Plan to ensure compliance with the Nine Minimum Controls and the Long-Term Control Plan.

241.   SFPUC has failed to comply with these requirements. *See* Exhibit 1 at Exhibit A, Table 6. Operation and maintenance failures listed in Table 6 violated the requirement to operate the Southeast Plant and North Point Facility at maximum treatable flow during wet weather.

242.   Operation and maintenance failures violated the prohibition against dry weather CSOs from Discharge Point No. 002 on at least the following dates: August 5, 2021; March 17, 2023, and June 25, 2023.

243.   SFPUC fails to ensure that floatables and settlable solids are not discharged in violation of the Nine Minimum Controls. SFPUC's Combined sewer overflows contain large amounts of visible trash and other floatables which the Nine Minimum Controls prohibit.

244.   The Bayside Permit's "Long Term Control Plan" term requires capture of "100 percent of the combined sewage flow collected in the combined sewage system during precipitation events" for equivalent-to-primary, primary, or secondary treatment. Bayside Permit § VI.C.5.c.ii.

245. Discharges from the Bayside Facilities to Mission Creek violate the Bayside Permit's "Long Term Control Plan" term every time these facilities overflow during rain events or bypass normal treatment processes during dry weather.

246. In addition, millions of gallons of untreated combined wastewater discharged into the San Francisco Bay due to flooding on or about October 24, 2021 and December 31, 2022, in violation of the Bayside Permit's "Long Term Control Plan" section VI.C.5.c.ii.

247. SFPUC's self-reporting indicate wet weather facility operating parameter violations. *See* Exhibit 1 at Exhibit A, Table 7.

248. CSO events caused standard threshold values (STV) for concentrations of enterococcus and/or E. Coli exceeding applicable water quality standards. *See* Exhibit 1 at Exhibit A, Table 5.

249. SFPUC has and continues to operate its combined sewer discharges in ways not authorized by the Bayside Permit and which are inconsistent with its Long-Term Control Plan and Operations and Maintenance Plan.

250. The Oceanside Permit incorporates various Combined Sewer Overflow Controls. *See* Oceanside Permit § VI.C.5.

251. The Oceanside Permit requires compliance with the Nine Minimum Controls. *See* Oceanside Permit § VI.C.5.b.

252. The Oceanside Permit requires an appropriate Long-Term Control Plan and compliance with the requirements of that Long-Term Control Plan. *See* Oceanside Permit § VI.C.5.c.

253. The Oceanside Permit requires SFPUC to have and follow an Operations and Maintenance Plan to ensure compliance with the Nine Minimum Controls and the Long-Term Control Plan.

254. SFPUC's self-reporting indicate at least three combined sewer system operation and/or maintenance failures in the last five years. *See* Exhibit 2, Table 3.

255. These operation and maintenance failures further violated the prohibition against dry weather CSOs from Discharge Point No. 002 on at least one occasion during the last five years. *See* Exhibit 2 at Table 3.

256.     The City and SFPUC also fail to ensure that floatables and settlable solids are not discharged in violation of the Nine Minimum Controls. SFPUC's CSOs contain large amounts of visible trash and other floatables which the Nine Minimum Controls bar SFPUC from discharging in its combined sewer overflows.

257.     SFPUC's existing safeguards against floatables are ineffective and do not meet the requirements of the Nine Minimum Controls or its Clean Water Act permits.

258.     The Oceanside Permit's "Long Term Control Plan" term requires capture of "100 percent of the combined wastewater and stormwater flow collected in the combined sewer system during precipitation events" for equivalent-to-primary, primary, or secondary treatment. Oceanside Permit § VI.C.5.c.iii. The term also details the operating parameters for each wet weather facility, including flow and storage capacities required to be met prior to CSD events. *See id.* § VI.C.5.c.iv.

259.     SFPUC failed to capture 100 percent of the combined wastewater and stormwater flow collected in the combined sewer system during precipitation events for equivalent-to-primary, primary, or secondary treatment on at least one (1) occasion in the last five years. *See* Exhibit 2, Table 4. This information demonstrates at least one (1) violation and day of violation of the Oceanside Permit's "Long Term Control Plan" section VI.C.5.c.iii in the last five years.

260.     SFPUC's self-reporting indicates wet weather facility operating parameter violations on at least seven (7) occasions in the last five years. *See* Exhibit 2, Table 4.

261.     Each of these violations is ongoing and continuous.

262.     The City and SFPUC's Clean Water Act violations described in the paragraphs above will continue in the future until the City and SFPUC operate the Bayside and Oceanside Facilities in accordance with the Bayside and Oceanside Permits.

263.     By committing the acts and omissions alleged above after March 6, 2019, the City is subject to an assessment of civil monetary penalties for each and every violation of the Clean Water Act in the amount of up to $66,712 per day.

264.     An action for injunctive relief is authorized by Clean Water Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably

harm Baykeeper and Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

265.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against the City and SFPUC as set forth below.

**FIFTH CAUSE OF ACTION**

**Violations of Monitoring, Recordkeeping, and Reporting Requirements,**

**Bayside and Oceanside Permits and Clean Water Act**

**(33 U.S.C. §§ 1342, 1365(a) and 1365(f))**

266.   Baykeeper incorporates the allegations contained in paragraphs 1 to 187 as though fully set forth herein.

267.   Upon information and belief, SFPUC has failed to record all required information regarding each Bayside excursion into the excursion database required by the Bayside Permit.

268.   Upon information and belief, the City has failed to timely report each Bayside excursion with a volume of greater than 1,000 to the Regional Water Board and San Francisco Department of Public Health.

269.   Upon information and belief, SFPUC has failed to timely enter all required information about each Oceanside excursion in the CIWQS online database.

270.   Each of SFPUC's failures to fully report, record, and maintain as required by the Bayside and Oceanside Permits is a separate violation of the Permits and the Clean Water Act.

271.   Each of these violations is ongoing and continuous.

272.   The City and SFPUC's Clean Water Act violations described in the paragraphs above will continue in the future until the City and SFPUC operate the Bayside and Oceanside Facilities in accordance with the Bayside and Oceanside Permits.

273.   By committing the acts and omissions alleged above after March 6, 2019, the City is subject to an assessment of civil monetary penalties for each and every violation of the Clean Water Act in the amount of up to $66,712 per day.

274.     An action for injunctive relief is authorized by Clean Water Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Baykeeper and Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

275.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against the City and SFPUC as set forth below.

### SIXTH CAUSE OF ACTION

### Violations of Public Notification Requirements,

### Bayside and Oceanside Permits and Clean Water Act

### (33 U.S.C. §§ 1342, 1365(a) and 1365(f))

276.     Baykeeper incorporates the allegations contained in paragraphs 1 to 187 as though fully set forth herein.

277.     Upon information and belief, the SFPUC has failed to notify the public of locations and times of CSOs from the Bayside and Oceanside systems. SFPUC's failures include failing to place permanent signs at all Oceanside CSO outfalls, failing to ensure permanent signs are visible and legible from at least 50 feet on- and off-shore, and failing to timely warn the public at beaches and waterways where water contact recreation occurs on the Bayside and Oceanside.

278.     Upon information and belief, SFPUC discharged nearly 500,000,000 gallons of combined sewage across Ocean Beach during the 2022-23 wet season. However, the City did not post signs at the time of those discharges, or did not adequately inform beachgoers or the public of sufficient information to understand the health risks posed by the combined sewage discharges as required by the Oceanside Permit.

279.     Upon information and belief, SFPUC has failed to adequately post warning signs of potential public contact with wastewater on public property. SFPUC has failed to post information about excursions, overflows, backups, or sewage discharges onto streets, sidewalks and properties in the Marina Boulevard and Marina Green areas during storms in October 2021.

280.    Each of the City's failures to post warning signs when public contact with wastewater or CSO discharges could reasonably occur is a separate violation of the City's Oceanside and Bayside Permits.

281.    Each of these violations is ongoing and continuous.

282.    The City and SFPUC's Clean Water Act violations described in the paragraphs above will continue in the future until the City and SFPUC operate the Bayside and Oceanside Facilities in accordance with the Bayside and Oceanside Permits.

283.    By committing the acts and omissions alleged above after March 6, 2019, the City is subject to an assessment of civil monetary penalties for each and every violation of the Clean Water Act in the amount of up to $66,712 per day.

284.    An action for injunctive relief is authorized by Clean Water Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Baykeeper and Baykeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

285.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Baykeeper prays for judgment against the City and SFPUC as set forth hereafter.

## VII.    **PRAYER FOR RELIEF**

Wherefore, Baykeeper respectfully requests that this Court grant the following relief:

a.    Enter judgment in favor of Baykeeper on each cause of action alleged herein;

b.    Declare the City and SFPUC to have violated and be in violation of the Clean Water Act and applicable NPDES Permits;

c.    Enjoin the City and SFPUC from any further violations of the Clean Water Act and applicable NPDES Permits, including ordering the City and SFPUC to promptly complete all actions necessary to ensure compliance with the Clean Water Act and its Permits;

d.    Order the City and SFPUC to pay civil monetary penalties in the amount of $66,712 per day per violation for each violation of the Clean Water Act;

e.      Award Baykeeper its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and

f.      Grant any other relief as this Court may deem just and appropriate.

Dated:      May 13, 2024                          Respectfully submitted,

**SAN FRANCISCO BAYKEEPER**

Eric Buescher
Nicole C. Sasaki

**SYCAMORE LAW**

Daniel Cooper
Jessica Hollinger
Kristina Hambley

*Attorneys for Intervenor-Plaintiff*
*San Francisco Baykeeper*